LOCAL 56, UNITED FOOD AND COMMERCIAL WORKERS UNION, et al., Plaintiffs,

v.

CAMPBELL SOUP COMPANY, et al., Defendants.

Master Docket
Civ. No. 93–MC–276 (SSB).

United States District Court,
D. New Jersey.

Aug. 31, 1995.

Theodore M. Lieverman, Robert F. O'Brien, Tomar, Simonoff, Adourian & O'Brien, Haddonfield, NJ, Alan Sandals, Berger & Montague, Philadelphia, PA, Ted Iorio, Brenda Meyer, Kalniz, Iorio & Feldstein, Toledo, OH, Joseph D. Shein, Philadelphia, PA, Sujeet K. Mohanty, Joseph D. Shein, P.C., Haddonfield, NJ, Renee L. Bowser, UFCW International Union, AFL–CIO & CLC, Washington, DC, for plaintiffs.

George G. O'Brien, Dechert Price & Rhoads, Princeton Pike Corporate Center, Princeton, NJ, Mary A. McLaughlin, Dechert, Price & Rhoads, Philadelphia, PA, for defendants.

**BROTMAN**, District Judge:

This class action arises out of Defendant Campbell Soup Company's ("Defendant Company")[1] unilateral reduction of health insurance benefits provided to retirees under the Company's medical plan. The court has jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e). Presently before the Court is Defendant Company's partial motion for summary judgment. For the reasons set forth below, the Court will grant the motion in part and deny it in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Benefit Plan: 1965—1985

Defendant Company first determined it would provide retirees with medical benefits in 1964. Historically, retirees received health insurance coverage at no cost and could purchase additional coverage at a modest cost for retirees' spouses and dependents. To provide such a retiree medical benefit package, the Company purchased a series of insurance policies from Provident Life and Accident Insurance Company ("Provident"). These policies, reflecting the terms of the retiree health benefit program, were in effect from approximately 1965 to August 1975.

Different Provident policies governed different Company locations since local unions would negotiate separate collective bargaining agreements with the Company on behalf of local union members. While different Provident policies may have been in effect, both parties agree that the substance of the medical insurance benefit was the same. Similarly, the parties concur that the Company has consistently presented unions with the option to participate in the single nationwide benefit program. Def.'s Brf. at 10, n. 7. Consequently, the terms of the benefits provided through the Provident policies did not alter according to location or a retiree's for-

---

1. Plaintiffs name three defendants: the Company, the benefit plan known as the Campbell Soup Company Voluntary Employment Benefit Plan and a trust association. Defendant Company however does not distinguish among these defendants and takes the position in its submissions to the court that it is the responsible entity in charge of overseeing the administration of the plan and capable of altering benefits available under its provisions. As a result, the court will treat the named defendants as one defendant for the purpose of resolving this motion.

mer employee class (i.e. salaried, non-union hourly or union hourly).

The Provident insurance policies outlined the terms of the retirees' benefit plans and included language suggesting when such coverage might terminate. At least three of these Provident Group Policy documents contained the following clause:

> The insurance with respect to all Employees insured under this policy shall automatically terminate when the policy is terminated by the Group Policyholder or the Insurance Co. as provided under the 'Termination of Group Policy' in Section V.

*See* Provident Group Policy No. 6376–1, 1970–1984, Ex. 1 to Mather Aff.; Provident Group Policy No. 6376–28, 1971–85, Ex. 2 to Mather Aff.; Provident Group Policy No. 6724–2, 1972–85, Ex. 3 to Mather Aff.

In 1970, the Company distributed the first summary plan document ("SPD") to its retired employees, entitled "Campbell's Group Insurance Program for Retired Employees." The booklet contained a question and answer section including the following statements:

> [Question] When does my insurance terminate?
>
> [Answer] Your insurance under the Plan will terminate immediately if the group policies are cancelled.

Mather Aff., Ex. 7. The SPD also contained what is commonly referred to as a reservation of rights clause as follows:

### NOTE

This booklet is intended as an outline of employee benefits for eligible retired employees of Campbell Soup Company and its domestic subsidiaries who, at the time of approved retirement, were covered by employee benefit plans as salaried employees or non-union hourly employees and who continue in good standing with the Company. This booklet should not be interpreted as a contract or a complete statement of the plans. The complete details of the plans are contained in contracts between Campbell Soup Company and hospital plans and insurance companies. Although it is hoped that their employee benefit plans will be permanent, the Company necessarily reserves the right to change, modify or discontinue them at any time without notice.

*Id.* By its terms, the SPD provided notice to retirees that the SPD was a summary and not a full exposition of the terms of the plan. Further, and more importantly, the SPD included explicit reservation of rights language within the Note reproduced above. While the Company issued the SPD referenced above to non-union employees, the Company avers that every SPD issued to union or non-union employees prior to 1974 as well as SPDs issued to union employees at the Napoleon, Ohio plant (covering the period 6/76 to 8/81), at the Paris, Texas plant (covering the period 10/76 to 8/81), at three Nebraska plants (covering the period 10/78 to 8/81), and at the Worthington, Minnesota plant (covering the period 10/78 to 8/81) contained a similar explicit reservation of right to "change, modify or discontinue" the plan "at any time without notice." Def.'s Reply Brf. at 9.

Plaintiffs have not pointed to any language contained in the Provident Policies or the 1971 SPD that speaks of either a "vested" or "lifetime" benefit. Pls.' Opp.Brf. at 41. Having reviewed all of the early pre–1985 documents referenced in counsels' submission, the Court similarly has not found any such terms. Plaintiffs appear to rely solely on a provision whereby a spouse or dependent may continue his or her coverage after a retiree's death to support its assertion that the early plan documents provided for vested lifetime benefits.

In 1981, the Company distributed a new SPD to salaried, non-union hourly and union hourly employees. The Company avers that this SPD was in effect from 1981 until 1991. The 1981 SPD included the same termination language ("Your insurance under the Plan will terminate immediately if the group policies are cancelled") as the 1970 SPD and the same Note language as the 1970 SPD, quoted above, with one exception. The last line of the Note reproduced above from the 1970 SPD, the express reservation of right language, is missing in the 1981 SPD. The 1981 SPD also contains language detailing what coverage is available after a retiree's death:

"If a retired employee dies while insured under this program, the spouse may continue the dependent coverage by paying the monthly cost while in a widowed status." Mather Aff., Ex. 7. Relying on this language, Plaintiffs assert the SPD represented that lifetime benefits would be available to retirees.

## B. *The Benefit Plan: 1985–1987*

In August, 1985, the Company switched to a self-funded plan, cancelling its insurance policies with Provident. Pls.' Opp.Brf. at 6. With the Company funding the program, it retained Provident to administer the medical benefits plan. Following this change from the Provident group insurance coverage to the self-funded plan, the parties concur that the retiree medical benefit program did not terminate and, apparently, the scope of available benefits was not altered. Plaintiffs assert, and Defendant Company does not dispute, that it did not notify retirees that the Provident insurance policies had been terminated or that a new administrative agreement had been entered into by the Company and Provident. Pls.' Opp.Brf. at 7.

Defendant contends that the significant plan document during this period was the "Administrative Services Agreement" ("ASA") existing between the Company and Provident, whereby the scope of Provident's responsibility was outlined. Def.'s Rply.Brf. at 35. The ASA provided that Provident's administrative fee could be increased to reflect higher administrative expenses.[2] *Id.* at 8. While the ASA characterized the relationship between the Company and Provident as plan administrator and provided that it could be terminated upon written notice, the document did not further describe the rights of the Company or Provident vis-a-vis the program beneficiaries namely retirees. In fact,

under the ASA, the Company was responsible for providing a "detailed description of the Benefit Program" which actually stated the terms of available plan benefits absent from the rather brief ASA. Mather Aff., Ex. 4. The 1981 SPD was attached to the ASA as Exhibit A, describing the retiree medical benefits provided under the plan.[3] Def.'s Brf. at 8. The SPD's provisions, as outlined *supra*, remained in force until 1991.

## C. *The Benefits Plan: 1987–1991*

In 1987, the Company reconstructed the manner in which it organized and funded the retirees medical benefits plan. Whereas it had formerly used Provident to administer the plan, the Company established a trust fund to finance the payment of medical benefits. A document entitled the Voluntary Employee Benefit Plan Trust Agreement created the trust and an association, the Voluntary Employee Benefit Association, to govern the fund.

The formal contours of the medical benefits program itself were set forth in a separate plan document known as the Campbell Soup Company Voluntary Employee Benefit Plan (the "Plan"). The VEBA plan document expressly incorporated the existing terms of the retirees medical plan, stating

> Whereas, Campbell Soup Company ... presently maintains a welfare plan known as Campbell's Group Insurance Program for Retired Employees, ... and [w]hereas, the Company now desires to provide such medical benefits for eligible retirees and dependents under the Campbell Soup Company Voluntary Employee Benefit Plan (the "Plan") ... and [w]hereas the Plan is intended to be a continuation of the medical benefit coverage previously provided under the Campbell's Group Insurance Program for Retired Employees.

---

**2.** The document read in pertinent part:

The Employer shall pay to the Provident an administration fee monthly during the continuation of this Agreement ... Increased expenses incurred by reason of changes in the Benefit Program will give the Provident the right to adjust the fee effective on the date such changes in benefits are effective.... Def.'s Ex. 4.

**3.** The Company stated that there was a separate SPD which applied to salaried employees and retirees at the General Office, located in Camden, N.J. Under the heading "Eligibility, Effective Date and Termination of Coverage," the SPD provided under a hearing that "[t]he coverage ... shall automatically terminate when the plan is terminated by the Employer or the Administrator." The document did not include any additional language concerning reservation of rights.

Mather Aff., Ex. 6. The quoted language may be understood to convey that the Company, through the Plan and Trust, intended to institute a new medical benefits plan with the same actual benefit terms as previously existed but in reliance on a new plan document.

The same plan document also included provisions for the amendment or termination of the VEBA Trust or Plan. In addressing how either of them could be amended, the language of the VEBA plan document reserved the right to amend to the President:

> Article XI —
> Amendment of Plan and Trust Agreement: Merger or Consolidation 11.1 *Amendment.* The President of the Company shall have the right to amend the Plan and the Trust Agreement at any time, subject to [limitations inapplicable to this matter].

Mather Aff., Ex. 6. While this provision arguably applies, when read in context, to a situation where a successor entity or plan would be taking over administration of the plan following a merger, the parties concur that the VEBA plan document contains an explicit reservation of rights. Pls.' Opp.Brf. at 8.

The clearest reservation of rights language appears in a subsequent section of the VEBA plan document. In Article XII, the plan document declares the following:

> 12.1 *Termination.* The Company and each Participating Affiliate hope and expect to continue the Plan and Trust for such period of time as may be necessary to accomplish the purposes for which it was created. Nevertheless, *the Company reserves the right to terminate or partially terminate this Plan or the accompanying Trust Agreement, or both, at any time, by action of either its Board of Directors or its President. Moreover, the President of the Company shall have the right to terminate or partially terminate the Plan as to each Participating Affiliate at any time.* (emphasis added).

Mather Aff., Ex. 6. Notably, the provision above reserved significant discretion to the President, granting the President broad power such that he or she could even select a particular affiliate and terminate that affili-ate's access to the plan. Thus, all agree that the VEBA plan document contained an explicit reservation of rights clause that may bear upon the retirees' claim of vested lifetime benefits. Pls.' Opp.Brf. at 8. Note, however, that according to the parties, neither the retirees nor the unions were supplied with copies of the VEBA plan document and the Company did not provide the retirees or the unions with formal notice of the Company's reliance on the Trust and Plan as the primary enabling documents for the plan. Def.'s Reply Brf. at 11.

During the pendency of the VEBA plan document, the parties agree that the same 1981 SPD, discussed above, continued to be the sole SPD distributed to all the Company's retirees. The Company allegedly anticipated distributing a new SPD to the retirees in 1989, according to a memorandum prepared by Provident which suggested that the Company was in the process of making changes to a benefits "booklet." Mather Aff., Ex. 4. The "proof" contained the following cautionary note as part of a booklet section entitled "Your Rights To Information On the Plan (ERISA)": "The right is reserved in the Plan for the Plan Sponsor to terminate, suspend, withdraw, amend or modify the Plan in whole or in part at any time, subject to the applicable provisions of the Plan." *Id.*

The only other documentation the Company distributed were Summary Annual Reports ("SAR(s)"), as distinguished from SPDs. The SARs' purpose was to notify beneficiaries of the trust's financial status. Of the three SARs submitted as exhibits, dated 1988, 1990, and 1991, the last two SARs contained the same specific reservation of rights clause: "The Company reserves the right to terminate, suspend, revoke, amend, modify or change the Plan at any time. The Company's health care coverages are subject to change in the future." Pls.' Ex. 14. The Company sent the SARs to retirees but not to union representatives. Pls.' Opp.Brf. at 8.

### D. *The Collective Bargaining Agreements*

Numerous collective bargaining agreements ("CBAs") memorialize the terms and

conditions of Defendant Company's relationship with union employees at various locations across the country. Each CBA contains a clause indicating its effective dates. Typically, each CBA remained in effect for two, three or, occasionally, four years. More than one hundred CBAs have been submitted as exhibits in support of the present motion.

With remarkable uniformity of language, the CBAs contain three provisions that bear on this motion. First, the CBAs, almost without exception, include a general clause reserving to the Company "[a]ny of the rights, power or authority the Company had prior to the signing of this Agreement ... except those specifically delegated, granted or modified by this Agreement."[4] This clause appears under the heading "Rights of Management." Second, each CBA contains a section entitled "Health, Safety and Welfare" which refers the reader to attachments "outlining" plan benefits. The pertinent provision typically reads:

**4.** This language appears in almost every CBA in force as early as 1970 and as late as 1992. *See, e.g.* 1988 Camden Agreement, Mather Aff., Ex. 8 at 40; 1986 Camden Agreement, Mather Aff., Ex. 9 at 49; 1991 Napoleon Agreement, Mather Aff., Ex. 10 at 28. There are only two or three exceptions. Neither party attributes significance to the absence of the clause in those two or three exceptions.

**5.** A standard description of the plan which is attached to the CBAs, reads as follows:

A Retiree Medical Program will be extended to any employee who retires on and after November 30, 1970 who at the time of approved retirement (age 55 or over) has at least ten years of continuous service and continues in good standing with the Company. In addition, any employee who terminates employment because of total disability after at least 10 years of continuous service shall be considered a retired employee for purposes of this medical program. In general, for individuals 55 but under 65, the program, consists of a 70 day Comprehensive Hospital Plan and a $25,000 per calendar year, per person, Major Medical Plan.
For individuals 65 or over, after the payment of any Medicare hospital or medical benefits which are paid or payable, a Comprehensive Major Medical Plan providing up to $25,000 per calendar year, per person, shall be available.... The Company will pay the cost of the retired employee's program and he/she may cover all eligible dependents by paying the monthly premium which would normally be deducted from the pension checks. If a retired

The Company will provide a security benefit program, including a Retiree Medical Program, Retirement and Pension Plan, [and other life, disability and assorted plans]. These plans will be administered by the Company ... Attached to this Agreement for informational purposes are outlines of the benefit plans.

1988 Camden Agreement, Mather Aff., Ex. 8 at 41. Third, as referenced in the "Health, Safety and Welfare" section, the CBAs include an outline of benefits describing the welfare benefits plan under the title "Retiree Medical Program."[5] Some CBAs, before describing available benefits, also indicated that the description contained as an attachment to the CBA was merely a summary and that benefit plan documents would be controlling.[6] The Court having reviewed the excerpted CBAs submitted as exhibits, it appears that *none* of the CBAs contained any precise language whatsoever such as "the Company will

employee dies while insured under this program, the spouse may continue dependent coverage by paying the monthly premium while in a widower/widow status. In addition, if an active employee dies and had at least ten years of service upon his/her death, the remaining spouse may be considered under the program provided he/she pays the cost of the dependent coverage in advance. In order for dependents to be eligible for coverage, the employee must have had them included under all the coverages which were available while actively employed. For employees who continue in employment beyond their Normal Retirement Date (age 65), the Company will pay the cost of Medicare "Part B" for the employee and the spouse. The Company's payment ceases upon actual retirement or death of the employee, whichever occurs first.
The exact language contained in the CBAs' benefits outlines did change from 1970 to 1992. For instance the total benefit limit increased from $5000 in the 1970s to $25,000 by the late 1980s.

**6.** For instance, the 1989–1992 CBA for Union 271 in Nebraska stated, "the following outlines generally the employee [and retiree] benefit program referred to in Article XVII. It is understood that the terms of the benefit contracts shall be controlling." Mather Aff., Ex. 11 at 36. And the 1989–1992 CBA for Local 27 of Chestertown Maryland included the same language. "The following outlines generally the Employee Benefit Program referred to in Article Ten. It is understood that the terms of the benefit contract shall be controlling." Appendix to Def.'s Rply. Brf., Vol. II, Ex. V.

provide health insurance coverage for a retiree until the retiree's death" or, for instance, a more explicit reference to "lifetime health benefits." Further, descriptions of benefits do not spell out the duration of the medical benefits.

Although the Company and union officials generally negotiated CBAs on a plant-by-plant basis, the terms of retiree medical package offered retirees, referenced by CBAs, were uniform and applied equally to all plant locations in the United States. Pls.' Opp.Brf. at 16, 18.

## E. *The Modification of the Benefit Plan*

The calculation of available reimbursement benefits was consistent from the initiation of the medical benefits plan until the end of 1991. Before the modification of the plan in January 1992, Defendant Company would pay eighty percent of eligible medical costs incurred by a retiree or covered dependent which exceeded the available Medicare benefit. In other words, the plan operated according to a "benefits less benefits" approach where if Medicare paid eighty percent of reasonable charges, the Company plan would pay approximately eighty percent of the remaining twenty percent of the outstanding reasonable charges.

The modification at issue here, announced by letter to all retirees on November 11, 1991 and more fully explained in a subsequent letter of December 31, 1991, provided that the Company plan would no longer cover eighty percent of the remaining eligible costs but rather would only cover eighty percent of the total eligible charges. Thus, the Company plan no longer ascribed to a "benefits within benefits" approach. Instead, the new medical benefit significantly increased the out-of-pocket costs of retirees who, under the new plan, would be responsible for much of the remainder after Medicare had paid its share. The modification took effect as of January 1, 1992. As the Company announced the change in the reimbursement schedule, it also announced a pension benefit increase.

A group of retired employees, their spouses and dependents, and two local unions (collectively "Plaintiffs") challenge the Company's modification of the medical benefits plan pursuant to the Employee Retirement Income Security Act ("ERISA") contending that such modification denies plaintiffs vested benefits under the plan and thus, violates ERISA. 29 U.S.C. § 1132(a)(1) and (3).

First, Plaintiffs seek to enforce the plan's provisions as written before the Company's modification. Plaintiffs further allege the Company undertook the reduction in benefits without properly reserving the right to amend the plan's provisions and without proper notice to the class.

Second, having allegedly made affirmative representations that plaintiffs would receive lifetime benefits, plaintiff argue the Company breached its fiduciary duty to disclose material information about the plan to plaintiffs. Consequently, plaintiffs conclude the Company violated ERISA provisions concerning disclosure and the duty of plan fiduciaries. 29 U.S.C. § 1102, § 1104. Additionally, Plaintiffs allege the Company's unilateral modification of retirees' and their dependents' health benefits amounts to a denial of contractually guaranteed benefits contained in collective bargaining agreements, in violation of § 301 of the Labor Management Relations Act of 1947 ("LMRA").

Third, Plaintiffs assert a more limited claim on behalf of two class members who sought to review plan documents but were neither provided with copies or an opportunity to review them.[7] As a result, Plaintiffs argue that in denying these plaintiffs this opportunity, the plan administrator disregarded ERISA's requirements permitting

---

7. Defendant Company has only moved for summary judgment on the first two of Plaintiffs' claims, not the third.

such inspection. 29 U.S.C. §§ 1024(b)(2) and (b)(4), and 1132(a)(1) and (3).

Defendant Company moves for summary judgment on Plaintiffs' first two claims under ERISA and LMRA, asserting that it expressly reserved the right to amend the retirees health care benefits in the unambiguous plan documents and that the plan did not guarantee vested lifetime benefits. Similarly, Defendant Company argues that it breached no fiduciary duty owed pursuant to ERISA. Defendant Company further disputes that it violated any collective bargaining agreement for no collective bargaining agreement contained a promise of lifetime benefits. Hence, the Company maintains its modification of the health benefit plan did not amount to a violation of LMRA.

This matter is before the Court following the Judicial Panel on Multidistrict Litigation's consolidation of three separate actions. Two unions filed complaints simultaneously in district courts in New Jersey and Ohio challenging the Company's modification of the health benefit plan; another suit brought by the Company against a putative nationwide class of retirees, filed in Nebraska, sought a declaration of its rights to so modify its plan. (*Local 56, United Food and Commercial Workers v. Campbell Soup Co.*, Civil Action No. 92–3858 (D.N.J.)); *United Food and Commercial Workers International Union Local 626 v. Campbell Soup Co.*, Civil Action No. 3:92–7491 (N.D.Ohio); *Campbell Soup Co. v. United Food and Commercial Workers District Union Local 271*, Civil Action No. 8:92–479 (D.Neb.). After the transfer and consolidation of the cases, the parties stipulated to a nationwide class of plaintiffs pursuant to Fed.R.Civ.P. 23(b)(2). Once the Court certified the class, Plaintiffs filed an amended class action complaint at the end of 1993. Defendant Company then filed the instant motion. In response, Plaintiffs moved pursuant to Fed.R.Civ.P. 56(f) to stay Defendant's motion pending further discovery. Magistrate Judge Kugler granted plaintiffs' request for a stay and additional discovery in a Letter Opinion dated October 11, 1994. Following a period of discovery during which plaintiffs sought to identify evidence of Campbell's past conduct to determine whether Campbell had made previous unilateral changes to retiree medical benefits such as alterations or terminations of coverage, plaintiffs then filed their response to the instant motion.

## II. *SUMMARY JUDGMENT*

The standard for granting summary judgment is a stringent one. A court may grant summary judgment only when the materials of record show that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Tudor Dev. Group, Inc. v. U.S. Fidelity & Guar. Co.*, 968 F.2d 357, 359–60 (3d Cir.1992). In deciding whether there is a disputed issue of material fact, the court must resolve all doubts in favor of the non-moving party. *Desvi, Inc. v. Continental Ins. Co.*, 968 F.2d 307, 308 (3d Cir.1992). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be viewed in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

Federal Rule 56(c) mandates the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). However, the moving party bears the initial burden of demonstrating that the non-moving party has failed to make such a showing. *See Celotex*, 477 U.S. at 330–333, 106 S.Ct. at 2556–57. Once the moving party has done so, the non-moving party must then produce evidence, that, if viewed in the light most favorable to that party, shows that party has carried its burden with respect to all the elements of its prima facie case. If the non-moving party does not do so,

> there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as

a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552 (quoting Fed.R.Civ.P. 56(c)).

## III. *DISCUSSION*

### A. *The Law of ERISA*

■ ERISA recognizes two types of employee benefits plans: "employee pension benefit plans" and "employee welfare benefit plans." 29 U.S.C. § 1002(3). Medical benefits plans fall within the latter category. 29 U.S.C. §§ 186(c), 1002(1)(B). *See, generally, Deibler v. United Food and Commercial Workers' Local Union 23,* 973 F.2d 206 (3d Cir.1992).

■ ERISA distinguishes between pension and benefits plans, expressly exempting employee welfare benefit plans from ERISA's vesting requirements which pertain to employee pension plans. *See, Hozier v. Midwest Fasteners,* 908 F.2d 1155, 1160 (3d Cir.1990). This distinction reflects Congress' intent to encourage employers to create such benefits plans while permitting employers some flexibility in administering the plans. Such non-vested benefits may be altered or eliminated at any time. *Id.* Generally an employer may amend or terminate such a plan providing an employer follows amendment procedures consistent with the plan language and ERISA.

■ An ERISA plan has certain requirements. Every benefit plan must be established and maintained by a written instrument. 29 U.S.C. § 1102(a)(1). In general, on a breach of contract claim, informal oral or written modifications of such a plan are impermissible. *Hozier,* 908 F.2d at 1163 (surveying the consistent views on this point among the Second, Fourth, Fifth, Sixth, Tenth, Eleventh Circuit Courts of Appeal). The parties do not dispute that the plan at issue is an employee welfare plan governed by ERISA.

■ Since oral and informal written communication may not alter the terms of an ERISA plan, Plaintiffs' claim to lifetime benefits must exist pursuant to the terms of the benefits plan. *See, generally, In Re Unisys,* 58 F.3d 896, 903 (3d Cir.1995). In *In Re Unisys,* the most recent case on the issue of contractually vested benefits, the Third Circuit Court of Appeals provides clear guidance concerning the interpretation of an ERISA plan when faced with a claim to lifetime benefits such as here. The Circuit set forth the standard this Court will apply in determining whether a claim to lifetime benefits may be sustained, characterizing such a benefit as an "[e]xtra-ERISA commitment" that shall be identified in the plan documents and "stated in clear and express language." *Id.* (citing, among others, *Wise v. El Paso Natural Gas,* 986 F.2d 929 (5th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 196, 126 L.Ed.2d 154 (1993); *Gordon v. Barnes Pumps Inc.,* 999 F.2d 133, 137 (6th Cir. 1993)). Thus, for a medical benefit plan's benefits to be vested, an intent to vest such benefits should be evident from the language of the plan documents. The approach outlined by the Circuit's opinion in *Unisys* is not unlike that of the Eleventh Circuit whereby "any retirees' right to lifetime medical benefits at any particular cost can only be found if it is established by contract under the terms of the ERISA-governed benefit plan document." *Alday v. Container Corp. of America,* 906 F.2d 660, 665 (11th Cir.1990), *cert. denied,* 498 U.S. 1026, 111 S.Ct. 675, 112 L.Ed.2d 668 (1991).

■ Accordingly, the threshold question before the Court is whether the employees benefit plan documents contain vesting language or are ambiguous, both with respect to providing lifetime benefits and with respect to Defendant's reservation of right to amend the plan to limit those benefits. All parties concur that the determination of whether plan provisions are ambiguous is a question of law. *International Union v. Mack Trucks, Inc.,* 917 F.2d 107, 111 (3d Cir.1990), *cert. denied,* 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991). As the Circuit explained, in *Mellon Bank, N.A. v. Aetna Business Credit, Inc.:*

> It is the role of the judge to consider the words of the contract, the alternative

meaning suggested by counsel and the nature of the objective evidence to be offered in support of that meaning.

619 F.2d 1001, 1011 (3d Cir.1980). Hence, an analysis whether or not a benefit plan is ambiguous looks not only to the written words on the document pages but also "objective indicia" that may suggest "differing meanings." *Id.*

■ ERISA plans are to be construed as a whole. *Alexander v. Primerica Holdings, Inc.,* 967 F.2d 90, 93 (3d Cir.1992). The plan documents at issue here include group insurance policy documents as well as documents associated with Defendant's shift to a self-insured plan and other plan documents required by ERISA's disclosure provisions. 29 U.S.C. § 1024(b). Among the required documents, one of the most important is the Summary Plan Description ("SPD") provided to plan beneficiaries. The importance of SPDs stems from their role in the ERISA scheme as the *primary* informational document issued to plan beneficiaries to inform them of their rights and obligations under a plan. Under ERISA, employers must issue such SPDs. 29 U.S.C. § 1021. Since plan documents may be ambiguous, the Third Circuit has commented that

> [such] ambiguities ... underscore the advisability for employers to provide full and timely disclosures of their plans via Summary Plan Descriptions. Such disclosure would further ERISA's stated policy 'to protect ... the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto....' 29 U.S.C. § 1001(b).

*Smith v. Hartford Insurance Group,* 6 F.3d 131, 140 (3d Cir.1993). Accordingly, the Court now turns to the plan documents, including the SPDs to discern if any or all of the documents contain language that is ambiguous with respect to the rights of the parties.

## B. *A Vested Lifetime Benefit For Salaried and Non-union Hourly Retirees?*

Plaintiffs contend that Defendant Company promised salaried and non-union hourly retirees vested lifetime benefits not subject to modification. Dismissing Plaintiffs' contention entirely, Defendant Company argues that it is not obligated to provide lifetime health benefits to any of its retirees.

■ *Unisys* instructs that plan documents must contain clear and express language suggesting the Company's intent to vest retirees' medical benefits in order for plaintiffs to succeed on their claim that such benefits have vested. 1995 WL 380984 at *4. Such a requirement originates in the different manner in which Congress treated welfare benefits plans as opposed to pension plans as well as Congress' apparent decision to permit employers some flexibility in altering welfare benefit plans, unless an employer has otherwise contractually obligated itself to providing a certain level or type of benefit. *See, generally, Wise v. El Paso Natural Gas Company,* 986 F.2d 929, 934–35 (5th Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 196, 126 L.Ed.2d 154 (1993).[8]

Contending that the Company did enter into a contractual agreement with its eligible retirees, Plaintiffs argue that language in the pre–1985 insurance contracts between Provident and the Company guarantees such a benefit to retirees. They point to language expressing that upon a retiree's death, coverage may extend to a spouse or eligible dependent. According to Plaintiffs, "[t]his is a way, though not the only way, of expressing that the benefit shall last for life." Pls.' Opp.Brf. at 41.[9] Presumably the terms of

---

**8.** Plaintiffs argue that there is no presumption against the vesting of benefits which they must affirmatively overcome. Pls.' Rebuttal Brf. at 2. The court does not disagree. No statute could create barriers to an employer's right to assume contractual obligations thereby agreeing to provide vested health insurance benefits. However, it is also true that Congress did not vote ERISA into law with the intent that every health insurance plan would be an unchanging benefit for

retirees assumed to vest unless plan documents stated the opposite. The *Unisys* decision demonstrates simply that plaintiffs must show how their claim for vested benefits has support in the language of plan documents.

**9.** Plaintiffs argue that two cases support their interpretation of this language. Each is entirely distinguishable on this point. *Wittekamp v. Gulf & Western, Inc.,* 991 F.2d 1137, 1143–44 (3d

the 1981 SPD would have also conveyed the same message of available lifetime benefits to retirees as it stated "[i]f a retired employee dies while insured under this program, the spouse may continue the dependent coverage by paying the monthly costs while in a widowed state." Pls.' Opp.Brf. at 5.

While Plaintiffs argue such language reflects the existence of a vested benefit for eligible retirees, Defendant Company contends the referenced language cannot be so construed. In fact, Defendant Company disputes that there is any language in the plan documents that Plaintiffs reasonably could interpret as supporting their theory of vested benefits. Def.'s Brf. at 20 (arguing there is "no promise of lifetime benefits anywhere.")

The language in plan documents on which Plaintiffs rely is much weaker than explicit references to lifetime benefits which the courts have deemed insufficient to trump an employer's inclusion of reservation of rights language. For instance, in the Circuit's most recent consideration of such "vesting" language, *Unisys*, where plan documents expressly stated coverage would continue "for the rest of [a retiree's] life," the Circuit quoted its reasoning in *Schoonejongen v. Curtiss–Wright*, 18 F.3d 1034, 1042 (3d Cir. 1994), *rev'd on other grounds*, —— U.S. ——, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995), that even ' "unambiguous assurances that all retirees would have health insurance benefits" ' *do not* create vested benefits in the presence of a reservation of rights clause. 58 F.3d at 903. Similarly, the Circuit held the *Unisys* documents' straightforward promise in conjunction with reservation of rights clauses would *not* render plan documents ambiguous. *Id.* at 904.

In a notable decision from the Fourth Circuit Court of Appeals, the Circuit affirmed a district court's granting of summary judgment in favor of an employer, where a schedule,[10] deemed a non-plan document, distributed to all retiring employees, instructed the recipients that the employer would "continue this Coverage for you during the remainder of your lifetime at company expense." *Gable v. Sweetheart Cup Company, Inc.*, 35 F.3d

---

Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 309, 126 L.Ed.2d 256 (1993), involved a businessman's suit as purchaser of a company against the seller whereby the purchaser alleged certain fraudulent misrepresentations concerning the vesting of the company's retirees health benefits induced the purchaser to enter into the sale agreement to his detriment. In *Wittekamp*, the Circuit simply noted that the seller reasonably should have inquired further into the possibility that the plan language could be construed to suggest retirees' benefits had vested to discern his responsibility for expenses related to the benefit plans, as part of his negotiations for the multi-million dollar company. The Circuit presented a possible interpretation of benefit plan language to illustrate that the purchaser could not state a claim for justifiable reliance, while qualifying its reading as "certainly not the only reasonable reading of [the] passage." 991 F.2d at 1144. The Circuit concluded that a savvy purchaser would have at least "required more information on the vesting issue." Thus, Plaintiffs' reliance on the Circuit's illustration is misplaced. Moreover, the interpretation is dicta. The case did not present the Circuit with a meaningful opportunity to discuss vesting or ERISA. Consequently, the court will not rely on *Wittekamp*.

Plaintiff also cites *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 606–09, 610 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 291, 126 L.Ed.2d 240 (1993), for the proposition that "[an] agreement that provides for continuation of health benefits to [a] spouse after retirees dies, 'could be thought a promise to retired employees that they and their spouses will be covered for the rest of their lives.' " Pls.' Opp. Brf. at 42. And in fact, the agreement terms at issue in *Bidlack* included the following language: "both you and your spouse will be covered for the remainder of your lives." Indeed, such explicit language stated without qualification in a form to each newly retired employee "could be thought a promise." 993 F.2d at 606, 608. Yet like *Wittekamp*, Plaintiff's citation is less than helpful since the Plaintiffs in the present matter cannot rely on comparable language. Without comparable language, no such promise may be inferred.

**10.** The Fourth Circuit characterized the "Schedule II" forms given to each retiring employee as non-plan documents. *Gable*, 35 F.3d at 857, and n. 2. The Circuit relies on this characterization in holding that the defendant company reserved its right to amend or terminate the retirees' health benefits plan, concluding that the Schedule II forms amounted to mere informal albeit written amendments to the plan. To the extent the forms were informal amendments, they have less significance since under ERISA informal amendments of any type are disfavored. Nevertheless, the court emphasizes that in many cases of this type, plan participants as plaintiffs point to *much more* persuasive language than is present here as evidence of the vesting of benefits, with little success *even* on summary judgment.

851, 854 (1994). Discussing this language, the Circuit held that although retirees received such assurances in writing, the defendant's distribution of an insurance "certificate" containing reservation of rights language overrode any such assurance. Thus, comparing the language which Plaintiffs purports reflects their vested interests to explicit "vesting language" relied upon by *unsuccessful* plaintiffs in other cases, the absence of durational words in the Defendant Company's plan documents suggests the weakness of Plaintiffs' argument. In the plan documents at issue here, unlike those in *Unisys,* there are no analogous terms in any plan document referring to benefits "for life" or as existing for a retiree's "lifetime."

 Since Plaintiffs have failed to illustrate how plan document terms reflect the Company's intent to vest health benefits, the Court will consider an alternative reading of the plan documents. What if the plan documents are merely silent on the question of when benefits vest and the benefits' duration? If the plan documents are silent as to the vesting of benefits, Plaintiffs would read into the documents an implied vested benefit. Pls.' Opp.Brf. at 41.

The Court has already mentioned the *Curtiss–Wright* decision, which although reversed in part by the Supreme Court for other reasons, still provides valuable guidance and authority on the question of how to interpret such silence in plan documents. In *Curtiss–Wright,* the Circuit considered plan document language which referred only generally to a time when retirees' welfare benefits could end: "[w]hen your employment terminates, or you cease to be a member of a class eligible for insurance under any part of the plan, your insurance under that part of the plan will cease." 18 F.3d at 1036. Holding that the employer had reserved to itself the right to alter the benefits plan in the plan documents, the Circuit emphatically rejected the argument made by plaintiffs that "the Court below erred in failing to recognize that the documents in this case, when considered in light of all the surrounding evidence, created a non-terminable right to receive retiree health insurance benefits...." *Id.* at 1042. The Circuit was unpersuaded by plaintiffs'

broad brush approach. Yet, this is the same argument Plaintiffs proffer: "[t]he plan documents and totality of the circumstances permits a finding that medical benefits vest upon retirement." Pls.' Opp.Brf. at 41. The Court must, of course, in light of the Circuit's response to the same argument, similarly reject it. Without more specific terms in plan documents suggesting vested health insurance benefits exist, the Court may not intuit a vested benefit.

Therefore, the Court's conclusion conforms with similar holdings from other circuits. In a widely reported decision, cited with approval by the Third Circuit, the Fifth Circuit Court of Appeals held that plan documents did not articulate when retirees' health benefits vested and could not equal such an "affirmative contractual commitment." *Wise,* 986 F.2d at 938 (having identified reservation of rights clauses in plan documents, the court affirmed a district court's grant of summary judgment in favor of a defendant employer). Having found no plan language which could equal a pledge to provide benefits, the Circuit commented, "[t]o prevail, Plaintiffs must assert strong prohibitory or granting language; mere silence is not of itself abrogation [of defendant employer's ability to change benefits]." *Id.* Nor should this Court interpret the absence of durational language in the plan documents as an agreement by Defendant Company to vest Plaintiffs' health benefits. *See Alday v. Container Corporation of America,* 906 F.2d 660, 664 (11th Cir.1990), *cert. denied,* 498 U.S. 1026, 111 S.Ct. 675, 112 L.Ed.2d 668 (1991) (Having concluded "any retiree's right to lifetime medical benefits at a particular cost can only be found if it established by contracts," Circuit determined employer reserved right to alter or terminate plan).

Having shown that an intent to vest benefits should be present in the terms of the plan documents and will not be inferred from plan documents' silence, the Court notes, in contrast, two more extreme situations which *may* give rise to vested benefits. The facts of the instant matter do not parallel either factual circumstance explored in these cases. First, where the plan documents stated a retiree's coverage would continue until the

retiree's death, a written representation well-supported by extrinsic evidence, and defendant employer did not insert *any* language in the documents to reserve its rights prior to the disputed alteration, then one Circuit affirmed a district court's judgment in favor of vested benefits for employees. *Jensen v. SIPCO, Inc.*, 38 F.3d 945, 949, 951–52 (8th Cir.1994), *cert. denied, Sipco, Inc. v. Jensen,* — U.S. —, 115 S.Ct. 1428, 131 L.Ed.2d 310 (1995). Significantly, the Eleventh Circuit indicated their holding would differ if the plan document contained a reservation of rights clause, thus adopting an even stronger position than the Third Circuit by recognizing that "a reservation-of-rights provision is inconsistent with, and in most cases would defeat, a claim of vested benefits." *Id.* at 950; *Cf. Unisys,* at 903 n. 11.

Second, this Circuit held that an SPD containing both an ambiguous promise of vested lifetime benefits and an ambiguous reservation of rights clause, in the absence of any other plan document, was sufficiently ambiguous such that the district court could not, as a matter of law, grant summary judgment for defendant employer. *Alexander v. Primerica Holdings, Inc.*, 967 F.2d 90, 95 (3d Cir.1992). In *Primerica,* the Circuit found it significant that the reservation of rights clause was not a typical clause, reserving the employer's right to alter or amend "at any time" as in the present case, but rather reserved its rights so as to be "in conformity with applicable legislation." *Id.* at 93. Suggesting alternative interpretations of the document's reference to legislation and noting unqualified language would not be ambiguous, the Circuit distinguished cases similar to the instant matter in which a reservation clause was not qualified. Accordingly, the plan documents at issue here do not fit neatly within the two cases on which Plaintiffs rely, such that this Court could conclude that Plaintiffs present a triable issue with regard to the vesting of their benefits.

■ As the Circuit stated, a "plan participant bears the burden of proving, by a preponderance of the evidence, that the employer intended the welfare benefits to be vested." *Unisys,* at 902, (citation omitted). While Plaintiffs need not meet their burden

of proof in the context of summary judgment, they must present evidence by affidavit or through documents of Defendant Company's intent to assume this contractual obligation in order to survive Defendant's motion. Since the language of the plan documents contains no terms such as "lifetime" or "for the rest of your life" or any analogous durational language to reflect the Company's alleged intent to vest welfare benefits, the Court next considers whether existing terms could be considered ambiguous as a matter of law. To do so, it turns to the extrinsic evidence presented by plaintiffs in support of their alternative interpretation of the plan documents' terms.

■ Plaintiffs present little in the way of extrinsic evidence to support their reading of the documents. Plaintiffs appear to rely entirely on six class members' recollection of oral promises by Defendant Company employees, whereby the employees stated retirees would have welfare benefits for life. Pls.' Opp.Brf. at 27–28. But courts have repeatedly found such oral representations may not modify written plan documents. *Unisys,* at 902 (citations omitted). Therefore, employees may not assert such statements to bolster their claims. Accordingly, Plaintiffs have not met their burden to show the Court how the plan documents' language, or extrinsic evidence suggesting an alternative interpretation of such language, supports their view that the Company obligated itself to provide vested health benefits.

**C. *Did Defendant Company Reserve The Right to Alter the Salaried and Non–Union Employees Welfare Benefit Plan?***

Having determined Plaintiffs have not demonstrated a factual dispute regarding whether plan documents contain vesting language, the Court next addresses whether Defendant Company unambiguously reserved its rights to alter the retirees' employee benefits plan. Where an employer inserts a reservation of rights clause in plan documents, the Supreme Court has held that such language may be sufficient to protect an employer's rights. "ERISA does not create any substantive entitlement to employer-pro-

vided health benefits." *Curtiss–Wright v. Schoonejongen*, —— U.S. ——, 115 S.Ct. 1223, 1227, 131 L.Ed.2d 94 (1995). Indeed, in considering whether an employer effectively reserved the right to change a plan, the Court recognized that employers presumptively may alter such plans. Specifically, the Court stated "[e]mployers or other plan sponsors are generally free under ERISA, for any reason at any time to adopt, modify or terminate welfare plans." *Id.* In deciding *Curtiss–Wright*, the Court affirmed the Third Circuit Court of Appeals' holding that plan documents containing reservation of rights language may supersede any promise of vested benefits without generating ambiguities requiring resolution. *Schoonejongen v. Curtiss–Wright*, 18 F.3d at 1042. *See also Unisys*, at 904 (no such ambiguity present if employer describes plan as providing lifetime benefits but reserves right to terminate the plans); *Accord Alday v. Container Corporation of America*, 906 F.2d at 664 (11th Cir.1990) (employer reserved right to alter or terminate plan); *Gable v. Sweetheart Cup Company*, 35 F.3d at 853 ("company possessed a statutory right to amend or terminate the employee welfare benefit plan and that the plan documents in no way waived that right").

### 1. Pre–1981 SPDs and the Provident Policies Plan Documents

Defendant Company contends that it has expressly retained the right to change the benefits plans in all plan documents from the inception of the plan. The Company first notes that SPDs sent to retirees always contained termination language such as "Your insurance under the Plan will terminate immediately if the group policies are cancelled."

■ Defendant Company makes a similar argument to assert that the Provident group policies it held prior to beginning to self-fund its health benefits in 1985 also contained a reservation of rights clause. Def.'s Brf. at 22. The operative language on which it re-

lies stated "[t]he insurance ... shall automatically terminate when the policy is terminated by the Group Policyholder or the Insurance Company...." Defendant Company argues such language provides explicit notice to all plan participants of its right to terminate retirees' medical benefits. In contrast, Plaintiffs argue that language in the SPDs and Provident policies referring to the termination of insurance policies should not be read as an unambiguous reservation of rights. Pls.' Opp.Brf. at 42. Plaintiffs assert that such language merely describes the relationship between Provident and Defendant Company, and Provident's right to "limit or veto any change in the policy contemplated by the Company." *Id.* Plaintiffs, however, ignore that their interpretation of this language concedes the only parties with the ability to alter the provisions of the insurance policy were the Company and Provident. That Provident as well as Defendant Company had the right to terminate or alter the terms of the benefit policy does not undermine Defendant Company's express reservation.[11] Nor is it significant that Defendant Company did not choose to exercise its right by terminating health insurance benefits when it ultimately terminated the Provident policies in 1985.

■ Courts have found such language to constitute a meaningful unambiguous reservation of rights. In *Schoonejongen v. Curtiss–Wright Corp.*, the Circuit affirmed the district court's conclusion that Curtiss–Wright expressly reserved its right to amend using almost identical language: "Your insurance under the group policy will also terminate upon discontinuance of the group policy." 18 F.3d at 1038. Similarly, in another case where benefits initially depended on the purchase of group insurance policies, as here, the Fourth Circuit concluded that a company preserved its right to modify the plan by stating "[t]his Policy may be amended or discontinued at any time...." *Gable*, 35

---

11. Plaintiffs rely on a district court decision from the First Circuit as support. *United Steelworkers v. Newman–Crosby Steel, Inc.*, 822 F.Supp. 862, 865 (D.R.I.1993). However, the court in *United Steelworkers* apparently found that an employer intended to purchase life insurance for its retir-

ees and that the benefit had apparently vested. No similar findings have been made in this case. Valid authority of this Circuit supports this court's interpretation of the disputed reservation language. *See Schoonejongen v. Curtiss–Wright, infra.*

F.3d at 856. The *Gable* court noted that where an insurance policy is at issue, an employer's reservation of its right to modify the policy was equivalent to a reservation of the right to modify plan benefits generally. *Id.* Applying the *Curtiss–Wright* and *Gable* courts' reasoning to the case at bar, the Court finds Defendant Company's argument persuasive, concluding that those SPDs issued while the Company provided benefits pursuant to purchased insurance policies contained unambiguous reservation of rights language.

Further, Defendant Company correctly asserts that pre–1981 SPDs contained even more explicit language: "the Company necessarily reserves the right to change, modify or discontinue them at any time without notice." The Circuit has clearly indicated that such a clause is sufficient as a matter of law and is not ambiguous or subject to alternative interpretations. *Unisys,* at 903 n. 11; *Primerica,* 967 F.2d at 94–95; *see also Alday,* 906 F.2d at 662; *Moore v. Metropolitan Life Ins. Co.,* 856 F.2d 488, 490 (2d Cir.1988).

## 2. *The 1981 SPD*

Plaintiffs contend that the terms of the 1981 SPD are ambiguous. Specifically, Plaintiffs argue that the difference between the 1981 SPD and earlier pre–1981 SPDs raises a genuine issue of material fact with regard to Defendant Company's intent to reserve the right to amend or alter retirees benefits. Pls.' Opp.Brf. at 44–45. The difference between the 1981 SPD and pre–1981 SPDs is that the earlier SPDs contained an explicit reservation of rights clause preserving the Company's ability to "change, modify or discontinue" benefits "at any time." The 1981 SPD did not. Construing the absence of the language as an indication that Defendant Company regarded employee health benefits as vested and non-terminable, Plaintiffs argue that after 1981 the Company did not intend to reserve the right to change the welfare benefit plan. As a result, Plaintiffs state this Court may not grant summary judgment in favor of Defendant Company for the purported ambiguousness of the 1981 SPD cannot be resolved as a matter of law.

Defendants vigorously oppose Plaintiffs' interpretation of the absence of the sentence as intentional or as evincing the Company's relinquishing of its ability to alter the medical benefits plan.

Since the Plaintiffs suggest an alternative view of an arguably ambiguous plan provision, the Court turns to extrinsic evidence presented on this issue to resolve any ambiguity, if possible. *See Mellon Bank, N.A.,* 619 F.2d at 1011. In so doing, the Court may look to at least three types of extrinsic evidence: intent, the reasonable understanding of the beneficiaries, and past practice. *Primerica,* 967 F.2d at 96. Plaintiffs however, have presented virtually no evidence in favor of their interpretation.

For instance, with regard to the Company's intent, Plaintiffs have not submitted affidavits from responsible officers of the Company, or other evidence, to bolster their assertion that the omission of one sentence reflects the Company's agreement that the benefits were unchanging. Instead, Plaintiffs merely refer to Defendant Company's course of conduct, noting that the medical benefits plan had not changed or been terminated. Pls.' Opp.Brf. at 45. Accordingly, Plaintiffs argue, the strongest evidence that the Company did not intend to reserve its rights after 1981 was that the plan had not been terminated. Plaintiffs did not reference any other extrinsic evidence to support its view of the significance of the 1981 SPD. Plaintiffs did not even state whether any class member noted the omission and attributed significance to the same. The Court could have considered such extrinsic evidence to discern the reasonable expectations of the plan beneficiaries.

The Court concludes that a more reasonable interpretation of the omission is that it created no ambiguity in light of all of the existing plan documents. As noted above, straightforward broad reservations of rights clauses existed in prior SPDs and subsequent plan documents contained similarly sweeping language, *see infra.* Thus, it appears that the Company always intended to retain the right to alter or terminate retiree benefit plans. As a result, it is not signifi-

cant in the context of a breach of contract claim that one SPD omitted certain language.

A factually similar case supports the Court's conclusion. In *Moore v. Metropolitan Life Ins. Co.*, 856 F.2d 488, 490, 492–93, where SPDs generally included an express reservation of rights clause, but one SPD did not, the Court held that the absence of the phrase from one SPD was not determinative and did not evince the employer's intent to relinquish any right. Further the Court stated, "[t]he single booklet omitting an express reservation of the right to amend or terminate medical benefits expressly noted that it was not a complete statement of the terms of the plans and was not the governing document." *Id.* at 492–93. Such was the case here. The 1981 SPD stated clearly that it was merely an outline of benefits, was not "a contract" and that plan participants should refer to the primary plan document to understand "the complete details." Accordingly, the Court finds the fact that a single SPD differs from earlier SPDs does not create ambiguity such that a triable issue exists as to Defendant Company's right to change the welfare benefits plan.[12]

### 3. *1985–1991 Plan Documents*

■■■■ Defendant Company argues that subsequent plan documents also contained express reservation of rights clauses. In 1985, when Defendant Company began to fund the welfare benefits plan, it cancelled the Provident policies and entered into an agreement with Provident to administer the program. Although Defendant Company urges the Court to recognize their agreement, the Administrative Services Agreement ("ASA"), as a formal plan document within the meaning of 29 U.S.C. § 1102(a)(1), the ASA is more properly understood as contract for services with an SPD as an exhibit attached rather than a plan document. A formal plan document is one which a plan participant could read to determine his or her rights or obligations under the plan. See *Curtiss-Wright*, —— U.S. ——, 115 S.Ct. at 1230, *quoting* H.R.Rep. No. 93–1280, p. 297 (1974) U.S.Code Cong. & Ad-

min.News pp. 4639, 5077, 5078. The only section of the ASA outlining available health benefits was the 1981 SPD attached as Exhibit A. None of the other terms of the ASA described health benefits; rather the ASA merely memorialized the obligations Provident and Defendant Company owed to each other. Nevertheless, Defendant Company asserts that the ASA, like the pre–1985 policies, also contained a reservation of rights clause. Its argument is moot however since the ASA may not be considered a formal plan document. As a result, the Court will not further scrutinize the ASA to determine whether it contains such a reservation.

Its arguments concerning the ASA notwithstanding, Defendant Company correctly suggests that a later plan document also contained reservation of rights language. In 1987, Defendant Company again changed the administrative mechanisms underlying the retirees' welfare benefits plan, using a trust agreement to establish a funding mechanism for the plan and another document, entitled "Campbell Soup Company Voluntary Employee Benefit Plan" ("VEBA" Plan) to set forth the terms of the plan and the specific benefit summaries as attached exhibits. The parties agree that the 1987 VEBA Plan document contained explicit reservation of rights language. Pls.' Opp.Brf. at 8.

■■■■ In summary, when Defendant Company sought to change the terms of its medical benefits plan in late 1991, many plan documents existed with different terms. Of these, none used the words "for life" or "lifetime" or similar phrases to discuss the duration of benefits. Further, both early and later plan documents contain clauses suggesting Defendant Company retained the right to alter or terminate the welfare benefit plan. This Court has, thus far, determined 1) that none of the documents contained unambiguous language suggesting that Plaintiffs could claim vested benefits and 2) that Defendant Company had consistently included adequate unambiguous reservation of rights language in plan documents, with some documents containing such clauses having been sent to retirees. Accordingly, the

---

**12.** The court notes that it is unfortunate that no additional SPDs were issued in the years from 1981 to 1991. This fact may bear on Plaintiffs' fiduciary duty claim, *infra*.

Court will enter summary judgment in favor of Defendant Company on the salaried and non-union hourly retirees' claim of breach of contract.

### D. *Did Collective Bargaining Agreements Guarantee a Vested Benefit For Union Employees And Did Defendant Company's Modification Violate LMRA?*

The contentions of the parties on this issue are straightforward. Defendant Company argues that while it entered into CBAs indicating a retiree medical benefit program would be available, none of the CBAs conferred a vested specific benefit upon retirees for the duration of their lives. In other words, the Company contends that the CBAs are silent documents with respect to both the particular terms of the medical benefits plan and with respect to the duration of any benefit plan and that no vested benefit may be inferred. Defendant Company draws these conclusions from an absence of express language in the CBAs, either in the body of the agreements or in the attached outlines of plan benefits. Further, Defendant Company relies on language contained in the CBAs under the title "Rights of Management" which reserve to the Company all rights not explicitly altered or bargained away in the CBAs themselves. Defendant Company additionally argues that even in the absence of the "Rights of Management" clause, it could alter the particular terms of the plans without violating ERISA as a matter of law. Accordingly, the Company argues that it retained the right to change the way medical benefits would be calculated for retirees and could do so without breaching any CBA in violation of the LMRA.

Plaintiffs assert that where retiree medical benefits are referenced in a CBA, the retiree medical benefits must be construed as a product of the collective bargaining process embodied in the CBA itself, and may not be changed without further bargaining and the unions' consent. Therefore, Plaintiffs assert that, like non-union and salaried retirees, union retirees have an unambiguous vested benefit that Defendant Company may not alter. Plaintiffs also contend that union retirees may have an even stronger argument in favor of a finding of vested benefits since the existence of the retiree medical plan is memorialized in bargained-for documents: CBAs.

 Having reviewed the contentions of the parties, the first issue presented is whether union retirees may claim vested benefits by virtue of unambiguous contractual agreements between the Company and the unions. The second related issue is whether the Company's unilateral alteration of specific medical benefit coverage violates the CBAs, thus giving rise to a valid claim under § 301 of the LMRA.[13] Pursuant to § 301, a federal court has jurisdiction over disputes arising out of "violations of contracts between an employer and a labor organization representing employees...." 29 U.S.C. § 185(a). When construing a collective bargaining agreement, a court generally looks to federal law. *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 456, 77 S.Ct. 912, 917, 1 L.Ed.2d 972 (1957). If not inconsistent with federal labor law, traditional rules of contract interpretation may be applied. *Sheet Metal Workers, Local 19 v. 2300 Group, Inc.*, 949 F.2d 1274, 1284 (3d Cir. 1991). If a court must interpret language of a collective bargaining agreement, it may examine the structure of the contract, the bargaining history, and the conduct of parties to determine whether a contract is ambiguous. *In Re Teamsters Industrial Employees Welfare Fund. et al. v. Rolls–Royce Motor Cars, Inc.*, 989 F.2d 132, 135 (3d Cir. 1993).

 To determine whether the CBAs provide retirees with contractually protected rights to vested medical benefits, the Court examined the relevant provisions of the CBAs. Upon a thorough review of all CBAs sections submitted, the Court can only come to the conclusion that no indicia of vested lifetime benefits or the intent to provide vested lifetime benefits can be derived from any reading of the CBAs or their attachments.

---

**13.** As Defendant Company correctly points out, there is a dearth of caselaw in the Third Circuit addressing whether an employer may alter benefits of a retiree medical plan referenced in a CBA. Def.'s Reply Brf. at 47, n. 39.

As set out in Section I(D) of this Opinion, each CBA generally indicates merely that the Company will provide *a* retiree medical program. Of course, such a program remains and has never been terminated in violation of the CBAs. The CBAs then reference a general descriptive statement of the retirees medical program attached to the primary CBA document. The program outlines attached to the CBA do not describe how benefits would be calculated which amounts to the central dispute between the parties. No one, however, could understand these attached descriptive outlines to be a full statement of the terms of a health benefit plan. Some CBAs even expressly state a benefit plan document is controlling rather than the language of the CBAs. Moreover, none of these bargained-for agreements actually provide that the benefits to be supplied by the Company are either lifetime benefits or benefits for a predetermined term. *See, e.g., Anderson v. Alpha Portland Industries, Inc.,* 836 F.2d 1512, 1518–19 (8th Cir.1988), *cert. denied, Anderson v. Slattery Group, Inc.,* 489 U.S. 1051, 109 S.Ct. 1310, 103 L.Ed.2d 579 (1989). *See* Section II(B). As such, there is no language from which a reasonable person could conclude that Defendant Company promised union retirees unchanging lifetime benefits. Plaintiffs' suggestion that the CBAs somehow articulated that union retirees would receive health benefits calculated according to a specific formula is quite simply inconsistent with the language of the CBAs.

The same analysis that the Court set forth in Section II(B) of this Opinion regarding allegedly vested benefits of salaried and non-union retirees applies here. The language in the CBAs is equally as bare as the SPDs and other plan documents of any references to lifetime benefits. In fact, a close reading of one recent CBA demonstrates that when the union and the Company sought to speak of

*vested* benefits, they did so with specificity, using precise language to describe certain benefits as "vested." *See* 1988–90 Camden Agreement for Union 80, Mather Aff., Ex. 8 at 53. Yet, in the same CBA the retiree medical benefits program section omits any such reference to "vested" benefits. Thus, this juxtaposition of specificity and silence does not make the Court more inclined to agree with Plaintiffs' position.

It is worth noting that during a time of rising medical costs and increasing numbers of deserving and dependant retirees, a company must retain its ability to control costs of existing benefits plans so as to ensure such plans' economic viability. This policy concern does not support an interpretation of CBAs to find vested benefits of perpetual duration. "Nor does any federal labor policy identified ... presumptively favor the finding of interminable rights to retiree insurance benefits when the collective bargaining agreement is silent." *International Union, United Auto., Aero., and Agric. Implement Workers of America v. Yard–Man, Inc.,* 716 F.2d 1476, 1482 (6th Cir.1983), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984). *See, generally, Bidlack v. Wheelabrator Corp.,* 993 F.2d 603, 607–09 (7th Cir. 1993) ("No doubt a court should cast a cold eye on contentions that a contract with a fixed term actually created a vested benefit" (citations omitted)).[14] *See also John Morrell & Co. v. United Food and Comm. Workers Int'l Union,* 37 F.3d 1302, 1304 (8th Cir.1994) ("[C]ourts are reluctant to read more benefits into an ERISA plan than its plain language confers.").

Additionally, it is beyond doubt that the Company retains any rights it has not bargained away and that here, the Company did not explicitly or even implicitly revoke its ability to change the particulars of its retirees medical benefit plan. Like the Court's

---

**14.** Note that the result in *Bidlack* whereby the Circuit reversed and remanded the trial court's grant of summary judgment in favor of the defendant union against a union, does not require the same result in the instant case. In *Bidlack,* all retirees received a form containing explicit vesting language: "both you and your spouse will be covered for the remainder of your lives." *Id.* at 606. The Circuit resolving *Bidlack* relied on this evidence in concluding that the language of the collective bargaining agreement was intended to confer lifetime benefits on retirees. There is no such form or any such language in any document in this case supporting such an inference regarding the duration of either the CBAs or the benefits enumerated within them. Therefore, the evidence in this matter suggests that an opposite disposition is proper.

analysis of the early SPDs and other plan documents and the Company's reservations of rights contained within, *see* Section II(C), the Company's express reservation in the CBAs may be analyzed in a similar light. No language of duration limits the Company's ability to modify the terms of the retirees medical plan.

While Plaintiffs argue the Company's unilateral alteration constituted a breach of contract, their argument is not supported by the parties' course of conduct. In fact, the Company has made at least two substantive changes in medical benefits offered prior to the modification at issue here. Defendant Company, instituted a prescription drug plan in 1987 and then, in 1991 required a copayment from plan participants. Similarly, in 1989, a vision benefit package was offered. These changes were made unilaterally. Thus, evidence of the bargaining relationship between the union and Defendant Company and prior benefits changes supports the Company's interpretation of its reservation of rights under the CBAs. *See Rolls–Royce,* 989 F.2d at 135.

Plaintiffs represent that the Company intended to provide the same benefits to union and non-union retirees alike. Pls.' Opp.Brf. at 45. Their representation thus supports the Court's finding that the collective bargaining agreement did not guarantee a vested benefit to union retirees. While the CBAs are relevant to the union retirees' understanding of their medical plans, no reasonable retiree could merely accept the outline attached to the CBAs as a clear statement of his or her health benefits. And yet Plaintiffs repeatedly argue that retirees believed they had earned vested lifetime benefits, even though none of the CBAs, SPDs or plan documents used terms such as "lifetime." Indeed, for more detailed and pertinent information, a retiree is required to turn to the *same documents* to which non-union

and salaried retirees turn. To the extent that both classes of retirees, union and non-union, ultimately rely on the same plan documents and SPDs to understand the substance of medical benefit plans, the distinction between classes, of which Plaintiffs make much, is rather insignificant.[15] For instance, there are no detailed CBAs here which would supplant union retirees' reliance on the same documents that all other retirees reviewed. Consequently, Plaintiffs' argument that the union retirees have an even stronger claim for vested benefits in accordance with the terms of the CBAs, even if other employees relying on SPDs and other plan documents do not, must fail.

While Plaintiffs suggest the CBAs do provide for vested benefits, a position with which the Court cannot agree, they argue, in the alternative, that the CBAs' language is ambiguous. Plaintiffs assert that extrinsic evidence supports their alternative view of the CBAs' provisions. The Court must disagree. None of the affidavits of union negotiators or depositions of Company negotiators illustrate that these affiants or deponents attempted to negotiate more than the existence of a retiree medical benefits plan. Further, no testimonial or documentary evidence supplied to the Court supports the view that union negotiators bargained with the Company to determine the details or identify the specific duration of retirees medical benefits. Consequently, the extrinsic evidence submitted by Plaintiffs does not support Plaintiffs' alternative view of the CBAs' terms. Thus, the Court concludes that the relevant language is unambiguous as a matter of law.

Upon reading the CBAs and considering extrinsic evidence in support of Plaintiffs' alternative interpretation of the CBAs, there is simply nothing to give rise to an inference of vested benefits or the inference that Defendant Company intended to give up its ability to modify such benefits.[16] According-

---

15. The retirees regardless of employment status shared the same benefits package. Since the benefits plan was identical, and uniformly offered across the country, it does not have the same character as a more idiosyncratic, bargained-for benefit. To the extent that the medical benefits plan was generic, this fact too suggests that the union retirees should not be treated differently than non-union or salaried retirees.

16. Plaintiffs argue that even if Defendant Company could alter the terms of the benefit plans for retirees, it could not do so in 1992 for those who had retired or would retire under CBAs then in force. Pls.' Opp. Brf. at 59; Def.'s Rply. Brf. at

ly, taking Plaintiffs' factual representations as true for the purpose of the instant motion, Plaintiffs have failed to show that a genuine issue of material fact remains concerning whether retirees have vested rights to medical benefits that prevail over the Company's right to modify its benefits plan or that the Company violated § 301 of LMRA as a result of such modification.

### E. *Do Plaintiffs State A Claim For Breach of Fiduciary Duty?*

 As the Third Circuit has emphatically stated in a very recent decision, the failure of Plaintiffs' breach of contract claim due to the unambiguous language in the plan documents *does not* foreclose the retirees' claims for relief based on a breach of fiduciary duty. *In Re Unisys Retiree Medical Benefit "ERISA" Litigation*, at 905 n. 13. ("*Unisys A* ").[17] Indeed, under *Unisys A*, such an action may be maintained pursuant to 502(a)(3)(B) of ERISA, 29 U.S.C. § 1132(a)(3)(B). *Unisys A*, at 897. The statutorily defined role of the fiduciary requires that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1). Pursuant to ERISA, fiduciaries must strive to inform plan participants and beneficiaries of important specific information. *Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 142–45, 105 S.Ct. 3085, 3089–91, 87 L.Ed.2d 96 (1985). As a result, the Circuit has held that as a fiduciary exercises these duties it "may not materially mislead those to whom the duties of loyalty and prudence ... are owed." *Fischer v. Phila. Elec. Co.*, 994 F.2d 130, 135 (3d Cir.) *cert. denied*, ── U.S. ──, 114 S.Ct. 622, 126 L.Ed.2d 586 (1993). For

instance, a fiduciary "may not make affirmative material misrepresentations to plan participants about changes to employee benefit plans." *Fischer*, 994 F.2d at 135. Similarly, the court held in *Bixler v. Central Pa. Teamsters Health and Welfare Fund*, 12 F.3d 1292, 1300 (3d Cir.1994), the duty to inform "entails not only a negative duty to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful." *See also Curcio v. John Hancock Mutual Life Insurance Co.*, 33 F.3d 226 (3d Cir.1994). Thus, the Circuit has concluded that "where a plan administrator ... fails to provide information when it knows that its failure to do so might cause harm, the plan administrator has breached its fiduciary duty to [plan participants and beneficiaries]." *Unisys A*, at 904 (emphasis added).

 A breach of fiduciary claim[18] is based on the statutory disclosure requirements set forth in ERISA, 29 U.S.C. § 1102, 1021, and 1022. *Unisys A*, at 903. As set forth by the Circuit, these statutes require that "every benefit plan be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102. In addition, "a summary plan description of employee benefit plan is to be furnished to plan participants ... which shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a)(1).

Most significantly for the case before the Court, § 1022(a)(1) continues "[a] summary of any material modification in the terms of the plan and any change in the information required under subsection (b) of this section shall be written in a manner calculated to be

---

63. Defendant Company responds that the CBAs do not bar its 1992 modification. The extent of the retiree medical benefit made part of the current CBAs was a $25000 cap on benefits and the existence of the retiree medical plan itself. None of this changed when Defendant Company modified the terms of the plan. Thus, the modification did not breach the rights of retirees who had retired while the relevant CBAs were in force or would retire within their pendency.

17. This aspect of the Unisys appeal was discussed in a separate opinion from the Circuit, No. 94–1875. (There were a number of related

opinions issued, all with different docket numbers.) For the purpose of clarity, this court's opinion will use a short form cite referring to *Unisys A*, to distinguish between the two Circuit opinions on which the court has relied.

18. Here, the breach of fiduciary duty claim primarily relates to summary plan documents. *See* Letter Opinion of Magistrate Judge Kugler, August 25, 1994 at 4. It does not rest upon Plaintiffs' claims that they "received any other communication, oral or written" that amounted to a misrepresentation. *Id.*

understood by the average plan participant and shall be furnished in accordance with section 1024(b)(1) of this title." 29 U.S.C. § 1022(a)(1) Among the explanatory information that must be included in a summary plan document pursuant to subsection (a) and listed in subsection (b) are "[t]he name and type of administration of the plan ... circumstances which may result in disqualification, ineligibility, or denial or loss of benefits; the source of financing of the plan and the identity of any organization through which benefits are provided ..." 29 U.S.C. § 1022(b).

 Of course, a summary plan description "must not have the effect [of] misleading, misinforming or failing to inform participants and beneficiaries." *Unisys A* at 903, *citing* 29 C.F.R. § 2520–102–2(b) (1987). Thus, summary plan documents are important informational tools for fiduciaries to use to communicate information about significant structural changes in plan documents or the status of the plan. *See, generally, Alexander v. Primerica Holdings, Inc.*, 967 F.2d 90, 93 (3d Cir.1992) (significance of summary plan documents and their power to inform participants of possible adverse changes).

This case presents a situation whereby the last SPD plan participants received was written in 1981. At that time, insurance policy documents constituted the relevant plan documents and set forth in detail what benefits were available to retirees and their dependents. Then, in 1985, Defendant Company terminated the insurance policies and created a self-funded plan. No SPD was issued to retirees at that time.

In 1987, Defendant Company undertook the complicated and presumably painstaking and expensive task of creating a trust structure and benefit plan, referred to as VEBA plan documents, through carefully drafted trust and plan documents. These documents set forth how Defendant Company would administer its retirees medical benefits plan in the future. Why it chose to completely change the underlying structure of the plan and its funding mechanism is not before the Court. However, this significant alteration was probably influenced by the growing costs

and administrative needs of the medical plan as larger numbers of retirees became eligible for the plan.

Thus, detailed, specific documents came out of the 1987 change. These documents included specific language concerning the role of the trustee, the name of the agent for service of process, amendment and termination procedures, as well as eligibility and claim procedures. All of this information is of the type explicitly enumerated in subsection (b) as significant information that an SPD should contain.

Notably, the new 1987 documents, presented by Defendant as "*the* document that governs the rights of all retirees,"[19] contained an all-inclusive reservation of rights clause. The parties agree that the 1987 reservation of rights clause is the most explicit reservation of rights clause present in any plan document in this case.

Again, like in 1985, Defendant Company did not issue a revised SPD to retirees although the company then relied on an entirely new set of plan documents. Therefore, in 1987, as in 1985, retirees would still have looked to the 1981 SPD, which did not have the same reservation of rights clause as the 1987 VEBA documents, for a statement of their rights and responsibilities under the benefits plan.

 While stating what an SPD must include in terms of relevant information, ERISA goes further. It also requires plan administrators to issue a new SPD;

> [following a] modification or change described in § 1022(a)(1) of this title, a summary description of such modification or change shall be furnished not later than 210 days after the end of the plan year in which the change is adopted to each participant, and to each beneficiary who is receiving benefits under the plan.

29 U.S.C. § 1024(b)(1) (1995 Supp.) As outlined above, § 1022 states certain changes require a new SPD including changes relating to the name and type of administration of the plan, circumstances relating to eligibility and termination of benefits, the source of

---

**19.** Def.'s Brf at 7. (emphasis added)

financing, and names of trustees. All of this information arguably changed in 1987 and arguably should have been incorporated into a new SPD. Indeed, if a new SPD was required, such SPD should have been issued by January, 1989. As no SPD was issued, the Company's 1991 modification of the retirees benefit plan generated a strong response from retirees, who allegedly were unaware of any structural change in the organization of the benefits program or that the underlying policy documents had been altered. In addition, Plaintiffs had never encountered an explicit broad reservation of rights in the 1981 SPD, as was present in the 1987 plan documents. Accordingly, the Company failed to communicate through the single [20] appropriate statutory mechanism specifically designed to ensure clear open communication between fiduciaries and plan participants. To the extent that the changes in the 1987 documents could lead to an impairment of retirees' legal rights at some time in the future, such scope of the changes was significant. For instance retirees' rights could be positively or negatively affected by language in the 1987 VEBA plan documents concerning 1) the insertion of the broadly worded explicit reservation of rights clause, 2) the termination and amendment provisions, 3) the identification of the agent named for the sole purpose of service of process, or 4) the identification of the trustee. The Court need not imagine further what ways in which the VEBA documents could impact retirees' rights. Instead, the Court must consider whether Defendant Company's failure to inform plan participants of relevant developments in the plan's organizational structure and underlying plan documents permits Plaintiffs to state a claim for a breach of fiduciary duty.

The significance of Defendant Company's failure to issue a new SPD here relates to the longstanding character of the retirees medical benefits plan. A relatively static plan provided similar health insurance benefits to retirees since the inception of the plan in the 1960s. Of course, Defendant Company had instituted certain changes in benefits particularly in later years but the most significant one by far was the one at issue in this litigation—the elimination of the "benefits within benefits" approach whereby the plan covered eighty percent charges above the eighty percent covered by Medicare. Issuing a SPD, regardless of what it said, would have reminded retirees that such a change had taken place, and, most importantly, reminded them that such a change warranted their careful attention and review. The issuance of a new SPD would have notified of the changes and attentive retirees might have been encouraged to request an opportunity to look at the new underlying plan documents to inform themselves of their rights and responsibilities in accordance with both the spirit and language of ERISA. Had a new SPD been issued in 1988, no reasonable person could have argued that he or she was unaware that the 1987 changes significantly altered underlying plan documents and the organizational structure of the plan itself. Of course, it is important to recall that Defendant Company relies on the 1987 documents as support for the present modification of benefits.

This may be a case where a substantive remedy should be available for violation of ERISA's reporting and disclosure requirements. *See, Ackerman v. Warnaco, Inc.,* 55 F.3d 117, 123–24 (3d Cir. May 15, 1995). The Circuit has acknowledged, in *Ackerman* and in *Hozier* that such "reporting and disclosure violations can 'wreak especially substantial harm' in the context of a dispute on the validity of a plan alteration." *Ackerman,* at 124, *quoting, Hozier,* 908 F.2d at 1168–69, n. 15. Thus, in *Ackerman,* the Circuit recognizes, for instance, the possibility of striking down a plan amendment as a remedy for such a violation. Here retirees argue that they have been significantly harmed as a result of Defendant Company's failure to make appropriate disclosures. Further, there is evidence supporting an inference that Defendant Company was aware of the need for a new SPD. At deposition, John J. Hague, a Defendant Company's employee, indicated that his department was aware of the importance of drafting and issuing a re-

---

**20.** Defendant Company did issue Summary Annual Reports. However, these are not the same as SPDs since the statute dictates SPDs' contents and date of issuance.

vised SPD for the VEBA documents but that they had not done so. Pls.' Appendix, Ex. 2 at 134–138. In fact, Hague admitted that the VEBA documents amounted to a change requiring a revised SPD. On these facts, there is at least a factual dispute regarding Defendant Company's intent[21] with regard to its retirees.

The disclosure requirements of ERISA are not empty suggestions for fiduciaries. They amount to specific guidelines imposed for the purpose of ensuring that plan participants can follow and gauge the availability and character of medical benefits plans, including the very structure of the benefit plan itself which may impact on participants' rights. Without adequate information, a participant cannot know or enforce his or her rights to benefits or anticipate alterations in benefits as were effected here by Defendant Company.

Plaintiffs state a claim for a breach of fiduciary duty. Accordingly, Defendant Company's motion for summary judgment on this claim will be denied.[22]

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment will be granted in part as to Plaintiffs' breach of contract claims pursuant to ERISA, 29 U.S.C. § 1132, and as to Plaintiffs' claims under § 301 of the LMRA, 29 U.S.C. § 185. However, Defendants' motion will be denied in part without prejudice as to Plaintiffs' breach of fiduciary duty claim pursuant to ERISA, 29 U.S.C. § 1132.

---

21. Evidence of bad faith or willfulness would be significant. *See Ackerman*, at 125 n. 8.

22. Accordingly, the case will go forward to develop a factual record regarding whether Defendant Company fulfilled its disclosure obligations, avoided issuing an SPD or intentionally sought to misinform retirees regarding the changes in the medical benefits plan either by not issuing a SPD or in some other way. The parties shall meet with Magistrate Judge Robert Kugler to set up a deposition schedule after which Defendant may renew its motion on this point.