INTERNATIONAL UNION, UNITED AU-
TOMOBILE, AEROSPACE & AGRI-
CULTURAL IMPLEMENT WORKERS
OF AMERICA, U.A.W., U.A.W. LOCAL
NO. 1697 and Theodore Ruef for Himself
and all Others Similarly Situated, Plain-
tiffs,

v.

SKINNER ENGINE COMPANY,
Defendant.

No. Civ.A. 93–289 ERIE.

United States District Court,
W.D. Pennsylvania.

July 30, 1998.

William Taggart, Erie, PA, for plaintiffs.

James T. Marnen, Knox, McLaughlin, Gornall & Sennett, Erie, PA, for defendant.

### OPINION

COHILL, District Judge.

This class action arises out of the termination of postretirement medical and life insurance benefit plans, sponsored by an employer for retired hourly union employees and their spouses. Presently before the Court are cross motions for summary judgment. For the reasons stated herein, we will deny plaintiffs' motion and grant defendant's motion.

### I. *Background*

#### A. The Setting

In December of 1990, the Financial Accounting Standards Board ("FASB"), a professional association that self-regulates the accounting practice, issued "Employers' Accounting for Postretirement Benefits Other Than Pensions, Statement of Financial Accounting Standards No. 106" (1990) ("FAS 106"). FAS 106 requires that employers report postretirement benefits on an accrual basis. Prior to its adoption, employers would report or account for postretirement benefits on a pay-as-you-go basis. The FASB was

concerned that as the "prevalence and magnitude of employers' promises to provide those [postretirement] benefits ... increased, there ... was increased concern about the failure of financial reporting to identify the financial effects of those promises." FAS 106. Employers with 500 or more employees were required to use FAS 106 in their financial reporting by 1993, while employers with fewer than 500 employees began use of FAS 106 in their financial reports by 1995. FAS 106 at 108.

The net effect of FAS 106 has been a significant reduction in current income for most corporations. As many had predicted, the impact of FAS 106 has been staggering: General Motors' FAS 106 expense was $20.8 billion in 1992. Doron P. Levin, "G.M. Lost $23.5 Billion Last Year," N.Y. Times, Feb. 12, 1993, at D1. Not surprisingly, FAS 106 has forced many employers to reexamine their retiree health care benefits and life insurance benefits in order to cut costs. In some instances, employers have terminated benefits altogether, giving rise to litigation.

### B. The Parties to this Action

Plaintiffs in this class action are International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, U.A.W. ("International Union"), U.A.W. Local No. 1697 ("Local 1697"), and class representative Theodore Ruef, all of Erie, Pennsylvania. International Union and Local 1697 are the exclusive collective bargaining agents for the hourly production and maintenance workers employed by defendant Skinner Engine Company, Inc. ("Skinner"), and in various matters represent former bargaining unit employees who are now retired. Plaintiff Theodore Ruef is a former hourly employee of Skinner and brings this action on behalf of himself and all other retired hourly workers of Skinner who retired before September 3, 1993, and spouses of those retirees. Skinner, located in Erie, Pennsylvania, manufactures and rebuilds Banbury intensive mixing machines for the rubber, plastics, and chemical industries and manufactures steam turbines and engines.

Effective September 3, 1993 Skinner stopped paying the medical and life insurance premiums for its retired, former hourly employees, and also cut off payment of half of the health insurance premiums for retirees' spouses. It had paid such insurance premiums for decades. Plaintiffs believed that the benefits at issue were lifetime benefits. Plaintiffs assert that Skinner's termination of benefits constitutes a breach of certain collective bargaining agreements ("CBAs"), and that Skinner breached its fiduciary duty under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*

Plaintiffs have filed a motion for summary judgment, arguing that the history between the parties, as well as the language of the various CBAs and plan documents, support their claim that fully paid health and life benefits were earned and vested as of the date of their retirement. Skinner has also filed a motion for summary judgment, arguing that the language of the CBAs indicates that vesting was never intended

### C. Chronology of Events

The following facts are undisputed. Skinner's hourly workers became affiliated with a union beginning in 1970. The parties entered into collective bargaining agreements covering time periods from 1974 to 1977, from 1977 to 1980, from 1980 to 1981, from 1981, to 1984, from 1986 to 1989, from 1989 to 1993, and from 1993 to 1996. In 1987 there were "economic reopener" negotiations. From 1984 through 1986, the union employees worked without a contract.

Before the 1993 CBA went into effect, Skinner paid all of its retirees' health care benefits, one half of the health care premiums for retiree's spouses until the spouses became 65 years old, and retirees' premiums on life insurance. Health insurance was also provided for dependent children, with the entire cost borne by Skinner, even though the CBAs did not address this issue.

The 1989 CBA was set to expire on June 30, 1993. With mandatory compliance with FAS 106 looming in the horizon, on May 10, 1993, prior to the completion of negotiations relative to the 1993 CBA, a letter was sent to nonunion retirees informing them of certain

changes in benefits effective July 1, 1993. These changes involved (1) eliminating life insurance for retirees, (2) requiring a copayment of premiums with respect to health insurance on retirees, and (3) eliminating health insurance for retirees' spouses under the age of 65. A right of conversion was provided with respect to retirees' life insurance and spousal health insurance, allowing that coverage to continue with payment of the premiums by the retiree or spouse.

This same letter was mistakenly sent to union retirees and alerted them to the problem. After the union retirees and officers of the union filed a grievance, the company acknowledged its error and stated that it would abide by the terms of the then-effective CBA (the 1989–93 CBA), and that the benefits provided for under that CBA would not be changed during its life. During the 1993 negotiations, the union took the position that the proposed changes applied only to future retirees. However, after the parties negotiated and agreed upon the 1993 CBA, Skinner implemented its changes with respect to union members who retired after the effective date of the 1993 CBA and their spouses, and also with respect to union members who retired before the effective date of the 1993 CBA, and their spouses.

During the course of 1993 contract negotiations, Skinner had tried to have the International Union and Local 1697 (collectively, "the union") agree to the changes for the hourly workers who were already retired. The union took the position that since retiree benefits are not a mandatory subject of bargaining, it would not bargain away such benefits. Curiously, the union also took the position that it did not represent its retired members during contract negotiations.

After three monthly extensions of the 1989 CBA, the union and Skinner entered into the 1993 CBA, effective October 1, 1993. They also executed a Letter of Understanding on September 3, 1993 to the effect that the 1993 CBA did not resolve their differences with respect to whether Skinner could lawfully make these changes. As of September 1993, the life insurance and health insurance for retirees' spouses were eliminated, and a copayment plan was instituted for retirees'

health insurance. This lawsuit was filed one month later on October 4, 1993.

From May 1993 to September 1993, during contract negotiations, Skinner continued to provide retirees with health and life insurance at no cost to them and it paid one-half of the cost of health insurance for their spouses to age 65. Likewise, during an earlier contract negotiation, from September 22, 1984 to July 1, 1986, these benefits were paid by Skinner as usual, even though the union was operating without a contract.

According to plaintiffs, Skinner did not regularly communicate with retirees concerning their benefits. This factual assertion arises because some plaintiffs have testified that they don't remember receiving summary plan descriptions ("SPDs"). Skinner appears to have adequately supplied health insurance SPDs to active employees and new hires, but may or may not have provided them to retirees. Copies of the CBAs were provided to union employees, but not to retirees. When the insurance plans were changed over the years, Skinner appropriately provided the new version of an SPD to employees.

The facts of this case differ from those of the case law to be discussed *infra*, in two respects. First, while Skinner retirees and current employees appear to have been under the impression that their retiree benefits would last for their lifetime, such an understanding is not found within the four corners of the CBAs or SPDs. Second, Skinner did not explicitly include the typical broad reservation of rights language in the CBAs, although as explained below, the vast majority of SPDs clearly state under what conditions benefits could be terminated.

Skinner denies that any member of its management ever stated or promised that its health care and life insurance benefits would last a retiree's lifetime. Joseph Orlando, the International Union representative, testified at his deposition that Raymond Rutkowski, then the president of Local 1697, specifically asked that the Insurance and Pension section of the 1986 CBA be amended to reflect the historic intent of the parties, i.e. that the insurance benefits were for the lives of the retirees. Mr. Rutkowski, however, had no

recollection of this at his deposition, and the 1986 CBA did not contain language to that effect. He could not recall whether he had stated in 1987 that the current retirees knew that the benefits would be provided "until the grave.", He, like many other employees, recall that "it was taken for granted that they [retirees'] were taken care of." Skinner appears to have reviewed benefits issues with retirees, or at least offered to do so, upon an employee's retirement, but there is no evidence that at any so-called "exit interviews" employees were wrongfully told that their life insurance and health insurance would be provided for a lifetime.

### D. The Agreements

The section of the various CBAs in question relating to life and medical insurance benefits is entitled "INSURANCE AND PENSION." Each CBA dating from 1971 through 1989 contained the word "retirees" in this section in regard to life insurance. For example, after addressing amounts of life insurance coverage for active employees, the 1986 CBA provides that "coverage *for retirees* shall remain at $3,000 during the term of this Agreement." 1986 CBA 44.6 (A0255) (emphasis added). Similarly, the 1989 CBA provides that life insurance "coverage *for retirees* shall remain at $3,500. However, future retirees will receive $4,000 effective on July 1, 1989." 1989 CBA 44.6 (A0289) (emphasis added).

On the other hand, with respect to medical insurance benefits, prior to 1986 the term "retirees" is only found in reference to retirees' spouses, not the retirees themselves. In the 1986 CBA, at 44.3, the word "retirees" was used only in the context of requiring retirees to enroll in a Medicare program, and not in the immediately preceding paragraph 44.2 of the Insurance and Pension section, which indicated that medical insurance would be provided. The 1986 CBA reads:

44.2 Blue Cross–Blue Shield Coverage

The Company will continue to provide the Blue Cross–Blue Shield hospitalization, prescription drug insurance policy with deductible and existing surgical insurance, all costs being borne by the Company.

44.3 Major Medical Insurance Coverage

The Company will continue to provide catastrophic major medical coverage, all costs being borne by the company. *Retirees* over 65 must enroll in Medicare A & B and B/C, B/S Supplementals.

A0256 (emphasis added). That preceding paragraph of the pre–1986 CBAs did not identify the beneficiaries of the program, either.

It was not until 1989 that any beneficiaries other than retirees' spouses were identified in the paragraph providing for major medical insurance. Paragraph 44.2 of the 1989 CBA states "[t]he Company will continue to provide the Blue Cross–Blue Shield hospitalization, prescription drug insurance policy with deductible and surgical insurance for *employees and retirees,* all costs being borne by the Company." (emphasis added). According to deposition testimony of those involved in the 1989 CBA negotiations, that language was added because the union feared that Skinner's new management would not honor the practice of providing the health care insurance benefits to union retirees. The union negotiators viewed this change in wording as a way to memorialize a commitment already in place. There was no discussion at that time about inserting the words "vested" or "lifetime" into the CBA.

Medical insurance for retirees's spouses has always been clearly provided. In all seven CBAs, there are the words to the effect that "[t]he Company will pay 50% of the cost of a *retiree spouse's* Blue Cross–Blue Shield insurance until spouse reaches 65 if she is under that age when he retires." 1986 CBA 44.9 (A0256) (emphasis added); *see* 1971 CBA 47.8 (A0815), 1974 CBA 47.8 (A0538), 1977 CBA 45.8 (A0566), 1980 CBA 45.8 (0595), 1981 CBA 44.8 (A0627), and 1989 CBA (A0290).

A review of the CBAs over the years indicates that when there was no change from one CBA to the next with respect to medical insurance provided to employees and retirees, the CBA would state that Skinner "will continue to provide" such coverage. Plaintiff characterizes this language as a promise of lifetime benefits. It appears that none of the CBAs contained any precise language what-

soever such as "the Company will provide health insurance coverage for a retiree until the retiree's death" or, for instance, a more explicit reference to "lifetime health benefits." Further, descriptions of benefits do not spell out the duration of the medical benefits. However, the last section of each CBA contains a statement describing the effective dates of the CBA, which included an effective date and termination date. Nearly all CBAs ran for a term of 3 years. The Insurance and Pension section of each of these CBAs indicated that "benefit improvements" were prospective only.

There are no words to the effect that life insurance or medical insurance benefits are vested. However, the Insurance and Pension section of each of the CBAs clearly and explicitly stated that pension benefits were vested. *See, e.g.,* 1986 CBA 44.7(c) (A0256) *and* 1989 CBA 44.7(c) (A0289).

The CBAs uniformly include a general clause recognizing the company's right to manage the plant, to hire, to choose the type of products to be manufactured, etc. In the earlier CBAs, this clause then states that "[t]he foregoing specifications of rights shall not be considered to include all the rights of management.... Any of management's rights shall be subject to the conditions provided in this Agreement." A0521 (1974 CBA), A0548 (1977 CBA), A0575 (1980 CBA), A0607 (1981 CBA). In the later CBAs, the clause reads, "All management functions and responsibilities which are not modified or restricted by a provision of this Agreement are retained and vested exclusively in the Company.... Provided, however, that in the exercise of its rights, the Company shall observe and be limited by the express written provisions of this Agreement." A0235 (1986 CBA), A0269 (1989 CBA). This clause appears under the heading "Management Rights." Skinner has not argued that these clauses can be construed as a reservation of rights clause.

The first paragraph of the Insurance and Pension section of each CBA contains the following statement in regard to the insurance and pension benefits provided: "Details of coverage are or will be set forth in the applicable policy or agreement." *See, e.g.,*

1989 CBA 44.1 (A0289). Health Care benefits to retirees was provided by Blue Cross of Western Pennsylvania and Pennsylvania Blue Shield. Commercial Union Life Insurance Company of America provided life insurance benefits to retirees beginning in 1986. The summary plan descriptions and policy documents state:

### TERMINATION OF COVERAGE

Coverage ends:

- If you are no longer an "eligible employee";
- If your dependent does not fit one of the classes of covered dependents;
- If premiums are not paid on time;
- If the plan is terminated, or your employer stops participating in it.

"Manufacturer's Association of Northwest Pennsylvania, Health Care Benefits, Blue Cross and Blue Shield Comprehensive Major Medical Plan—Plan 6" (undated) A0823, at 0849. *See also* "Manufacturer's Association of Northwest Pennsylvania, Health Care Benefits, Blue Cross and Blue Shield Catastrophic Major Medical Expense Program, Plans 1 and 2" (November 1987), A0853, at A0862; "Manufacturer's Association of Northwest Pennsylvania, Health Care Benefits, Blue Cross and Blue Shield Program, Plan 1" (November 1987) A0865, at A0891; "Manufacturer's Association of Northwest Pennsylvania, Health Care Benefits, Blue Cross and Blue Shield Catastrophic Major Medical Expense Program' (undated) A0347, at A0354.

However, what appears to be the SPD in effect at the time of the termination of benefits, entitled "Program of Blue Cross and Blue Shield Benefits, Skinner Engine Company, Group 80227, effective January 1, 1991" (August 1991) A0895, does not explain that coverage could be terminated upon termination of the plan by Skinner.

Most of the SPDs explain under the title "Intent of this Summary" that they were written "so it is easy for you to understand how the plan works. The official plan documents are the contracts between Blue Cross and Blue Shield and the Manufacturers Asso-

ciation of Erie. If there is any conflict or inconsistency between the contract and this summary, it is unintentional and the terms of the contract must govern." *See, e.g.,* 1987 SPD at A0864. By their terms these SPDs provided notice to retirees that the SPD was a summary and not a full exposition of the terms of the plan. Neither party has relied upon these "official plan documents" in their briefs, or has included them in their appendices.

## II. *Summary Judgment Standard*

Fed.R.Civ.P. 56(c) states, in relevant part, that summary judgment shall be granted:

> ... if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The facts must be viewed in the light most favorable to the non-moving party. *Sempier v. Johnson & Higgins,* 45 F.3d 724, 727 (3d Cir.1995). The non-moving party must then go beyond the pleadings and designate facts showing that a genuine issue of material fact remains for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Furthermore, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. *Discussion*

After a careful review of the depositions, answers to interrogatories, and all other relevant plan documentation, we hold that with respect to both the breach of contract claim and the breach of fiduciary duty claim, there is no genuine issue of material fact sufficient to have this case proceed to a jury trial.

### A. Breach of Contract Claim

Because ERISA regulates employee welfare plans,[1] many plaintiffs, including those

here, have asserted that termination or modification of their benefits violates ERISA because the health benefits are vested in the employee. ERISA does not specifically provide for vesting of welfare benefits, as opposed to pension benefits. *In re Unisys Corp. Retiree Medical Benefit "ERISA" Litigation,* 58 F.3d 896, 901 (3d Cir.1995) ("*Unisys II*"); *Hozier v. Midwest Fasteners, Inc.,* 908 F.2d 1155, 1160 (3d Cir.1990); *see* 29 U.S.C. §§ 1051, 1053. This distinction reflects Congress' intent to encourage employers to create such benefits plans while permitting employers some flexibility in administering the plans. Such non-vested benefits may usually be altered or eliminated at anytime. *Hozier,* 908 F.2d at 1160. Generally, a employer may amend or terminate such a plan providing an employer follows amendment procedures consistent with the plan language and ERISA.

 A plan itself may imply a vested benefit *Alexander v. Primerica Holdings, Inc.,* 967 F.2d 90, 95 (3d Cir.1992). The plan participant has the burden of proving by a preponderance of the evidence that the employer intended the welfare benefits to be vested. *Unisys II,* 58 F.3d at 902. An employer may by agreement provide a vested right in welfare plan benefits. *Id.* This issue becomes one of contract interpretation. Where the contract is unambiguous, the court must determine its meaning as a matter of law. But in the event of an ambiguity, a factual inquiry is required. *Alexander,* 967 F.2d at 96; *Taylor v. Continental Group Change in Control Severance Pay Plan,* 933 F.2d 1227, 1232 (3d Cir.1991).

 Every benefit plan under ERISA must be established and maintained by a written instrument. 29 U.S.C. § 1102(a)(1). Under ERISA's framework, an "employee benefit plan [is] governed by written documents and summary plan descriptions, which are the statutorily established means of informing participants and beneficiaries of the terms of their plan and its benefits." *Unisys,* 58 F.3d at 902. Accordingly, "any retirees right to lifetime medical benefits under a

---

1. ERISA recognizes two types of employee benefits plans: "employee pension benefit plans" and "employee welfare benefit plans." 29 U.S.C. § 1002(3). Medical benefits plans fall within the latter category. 29 U.S.C. §§ 186(c), 1002(1)(B).

plan can only be found if it is established by the terms of the ERISA-governed employee benefit plan." *Id.*

In interpreting the provisions of a plan governed by ERISA, terms "must be given their plain meanings, meanings which comport with the interpretation given by the average person." *Wickman v. Northwestern Nat'l Ins. Co.,* 908 F.2d 1077, 1084 (1st Cir.), *cert. denied,* 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 586 (1990). ERISA plans are to be construed as a whole. *Alexander,* 967 F.2d at 93. A term is ambiguous if it is subject to reasonable alternative interpretations. *Id.* 967 F.2d at 92. If, upon review, a court can find "but one reasonable interpretation, then *a fortiori* there can be no ambiguity." *Curcio v. John Hancock Mut. Life Ins. Co.,* 33 F.3d 226, 231 (3d Cir.1994). "However, if the language is susceptible to more than one reasonable interpretation, then it will be found to be ambiguous." *Id.* When a court holds that an ERISA plan is ambiguous as a matter of law, it "may consider the intent of the plan's sponsor, the reasonable understanding of the beneficiaries, and the past practices among other things." *Alexander,* 967 F.2d at 93.

Similarly, when interpreting the language of a CBA, we may examine the structure of the contract, the bargaining history, and the conduct of the parties to determine whether a contract is ambiguous. *Teamsters Indus., Employees Welfare Fund, et al. v. Rolls–Royce Motor Cars, Inc.,* 989 F.2d 132, 135 (3d Cir.1993).

In *Unisys II,* the United States Court of Appeals for the Third Circuit was asked to decide whether the district court erred in holding, on a breach of contract claim, that the summary plan descriptions that used the terms "lifetime" or "for life" to describe the duration of medical benefits, while at the same time reserving the right to modify or terminate at "any time" and "for any reason" the plans under which these benefits were provided, were unambiguous. The Third Circuit held that for medical benefit plans to be vested, an intent to vest such benefits should be evident from the language of the plan documents. The court quoted reasoning in *Schoonejongen v. Curtiss–Wright,* 18 F.3d 1034, 1042 (3d Cir.1994), *rev'd on other grounds,* 514 U.S. 73, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995), that even "unambiguous assurances that all retirees would have health insurance benefits" do not create vested benefits in the presence of a reservation of rights clause. 58 F.3d at 903. Similarly, the Third Circuit held that the Unisys documents' straightforward promise in conjunction with reservation of rights clauses would not render plan documents unambiguous. *Id.* at 904. The court rejected retirees' claim that the employer breached the terms of the plan.

The plaintiffs have failed to meet their burden by illustrating that the ERISA plan documents or the CBAs reflect any intention by Skinner to vest medical benefits on them. There is no terminology in the plan documents referring to benefits "for life" or referring to benefits as existing "for a retiree's lifetime." We find this language, or lack thereof, unambiguous. We hesitate to interpret the absence of durational language in the plan documents as an agreement by the employer to vest the retiree's health benefits. *See Local 56, United Food and Commercial Workers Union v. Campbell Soup Co.,* 898 F.Supp. 1118, 1132 (D.N.J. 1995) "To prevail, Plaintiffs must assert strong prohibitory or granting language, mere silence is not of itself abrogation [of defendant employer's ability to change benefits]." *Id., citing Wise v. El Paso Natural Gas Company,* 986 F.2d 929 (5th Cir.), *cert. denied,* 510 U.S. 870, 114 S.Ct. 196, 126 L.Ed.2d 154 (1993).

We next consider whether the existing terms could be considered ambiguous as a matter of law. To do so, we look to certain extrinsic evidence. Plaintiffs rely on the recollection of some class members that Skinner employees made oral promises that retirees would have welfare benefits for life. Oral statements may not modify written plan documents. *Unisys,* 58 F.3d at 902. There is no extrinsic evidence suggesting an alternative interpretation of the SPD language sufficient to show that Skinner obligated itself to provide vested health benefits.

To determine whether the CBAs provide retirees with contractually protected rights to vested medical benefits, we examine the relevant provisions of the CBAs. We hold that none of these bargained-for agreements actually provide that the benefits to be supplied by Skinner are lifetime benefits. The language of the CBAs is equally as bare as the SPDs and other plan documents of any references to lifetime benefits. In fact, when the union and the company sought to speak of vested benefits, they did so specifically in relation to "vested" pension benefits. In addition, Skinner retained all rights it had not bargained away, and the CBAs clearly define the length of their term.

Plaintiffs suggest that the CBAs' provisions are ambiguous. Even if this were the case, the extrinsic evidence does not support the cause of action. For example, there is no evidence of an attempt by the union or company to negotiate more than the existence of a retiree medical benefits plan. Union negotiators do not appear to have bargained with Skinner to determine the details or identity of the duration of the retirees' medical benefits. The union was not involved in drafting the terms of the SPDs. When a benefit outlined in one CBA was continued into the term of the subsequent CBA, the language of the subsequent CBA would state that "the Company will continue to provide" those benefits. We conclude that the relevant language is unambiguous as a matter of law.

■ We must also determine whether Skinner reserved the right to alter or terminate the welfare benefit plan. As was described above, the SPDs explain that the insurance would terminate when Skinner terminated the policy. In *Schoonejongen,* the Circuit affirmed the district court's conclusion that the employer expressly reserved its right to amend using almost identical language: "Your insurance under the, group policy will also terminate upon discontinuance of the group policy." 18 F.3d at 1038. We find this language unambiguous.

■ Since plaintiffs suggest an alternative view of an arguably ambiguous plan provision, we again look to extrinsic evidence to resolve any ambiguity, if possible. As described above, the 1991 SPD did not con-

tain a reservation of rights clause, however, the absence of the phrase from one SPD is not determinative and does not evince the employer's intent to relinquish any right. *Moore v. Metropolitan Life Ins. Co.,* 856 F.2d 488, 492–93 (2d Cir.1988). This does not create an ambiguity such that a triable issue exists as to Skinner's right to change the welfare benefits plan. *Campbell Soup,* 898 F.Supp. at 1136.

## B. Breach of Fiduciary Duty Claim

■ Any failure of plaintiffs' breach of contract claim due to the unambiguous language in the plan documents does not foreclose the retirees' claims for relief based on a breach of fiduciary duty. *Unisys II,* 58 F.3d at 905 n. 13. Under ERISA, fiduciaries have certain duties, which include "the disclosure of specified information." *Massachusetts Mutual Life Ins. Co. v. Russell,* 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985); *see* 29 U.S.C. §§ 1102, 1021 and 1022.

The Unisys litigation is instructive. The Unisys retirees had also alleged that the employer had breached fiduciary duties by misrepresenting to them that benefits were "for life" when in fact the plan language made benefits terminable. The evidence showed that "[t]he message that medical benefits would last for life was confirmed repeatedly and systematically throughout the ... organization, by all levels of management, in writing and verbally." *In re Unisys Corp. Retiree Medical Benefit "ERISA" Litigation,* 57 F.3d 1255, 1260 (3d Cir.1995) (*"Unisys I"*). Evidence also indicated that the highest levels of management recognized that employees believed their medical benefits were forever and could not be taken from them, and that the company knew that employees accelerated their retirement plans because of the belief that by retiring at a certain point in time, they would "lock in" the lifetime coverage that they had under the current plan. *Id.* 57 F.3d at 1257, 1266. The court recognized that an ERISA fiduciary "may not 'affirmatively mislead' plan participants," and further determined that equitable relief is available to retirees if a breach of fiduciary duty is proven. *Id.* Thus, the circuit has concluded that "where a plan admin-

istrator ... fails to provide information when it knows that its failure to do so might cause harm, the plan administrator has breached its fiduciary duty to individual plan participants and beneficiaries." 57 F.3d at 1264. The court noted.

> In recognizing the retirees' breach of fiduciary claim here, we do not intend to "create a precedent for any beneficiary to make claims beyond those provided in a plan. However, the facts and circumstances in this case clearly warrant our recognition of a claim of a fiduciary breach. Here the district court found that virtually the entire company management had consistently misrepresented the plan, not just on one occasion or to one employee, but over a period of many years both orally (in group meetings) and in writing (in newsletters) as well."

*Id.* at 1265.

In *Varity Corporation v. Howe,* 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996), the Court held that when a company intentionally misleads beneficiaries about the future of their benefits, the company is acting as a fiduciary. The court cautioned that a company does not act as a fiduciary "simply because it makes statements about its expected financial condition or because 'an ordinary business decision turn[ed] out to have an adverse impact on the plan.' " *Id.* 516 U.S. at 505, 116 S.Ct. 1065.

■ We see no legal requirement that Skinner should have advised retirees that their benefits were not vested. "Extra–ERISA commitments, such as the right to receive free lifetime coverage, must be found in the plan documents and stated in clear and express language." *Unisys II,* 58 F.3d at 902. In addition, there is no evidence of affirmative, material misrepresentations, or knowledge that any alleged silence might be harmful to retirees. Plaintiffs have not shown any repeated or systematic message from company officials, either written or oral. It simply appears that plaintiffs were under an assumption. We have no sufficient evidence that Skinner management actively cultivated that assumption, violated any fiduciary duty by letting the assumption continue, or knew that plaintiffs could suffer harm as a result. A party adverse to a motion for summary judgment "must set forth *specific facts* showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis added).

■ It appears that plaintiffs also allege an equitable estoppel theory within their breach of fiduciary duty argument. They allege that Skinner is equitably estopped from asserting a reservation of rights defense because Skinner did not have such a reservation in the CBAs. Plaintiffs must establish a material misrepresentation, reasonable detrimental reliance, and extraordinary circumstances. *Unisys II,* 58 F.3d at 907. Again, plaintiffs have failed to produce adequate proof. Any alleged detrimental reliance upon Skinner's alleged misrepresentations would not be "reasonable" in light of the unqualified reservation of rights clauses in the plans. *Id.*

For the foregoing reasons, we will deny plaintiffs' motion for summary judgment and grant defendant's motion for summary judgment.

### *ORDER*

AND NOW, to-wit, this 30th day of July, 1998, it is hereby ORDERED, ADJUDGED and DECREED that: (1) Plaintiffs' Motion for Summary Judgment (Doc. 22) is hereby DENIED; (2) Defendant's Motion for Summary Judgment (Doc. 26) is hereby DENIED AS MOOT; (3) Defendant's Amended Motion for Summary Judgment (Doc. 30) is hereby GRANTED; and (4) Plaintiffs' Motion to Extend Time (Doc. 34) is hereby DENIED as MOOT. The Clerk of Court shall mark this case CLOSED.